Donald L. Gaffney (#005717)
Benjamin W. Reeves (#025708)
**SNELL & WILMER L.L.P.**
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2202
Telephone: (602) 382-6000
Facsimile: (602) 382-6070
E-mail: dgaffney@swlaw.com
breeves@swlaw.com
Attorneys for CoBank ACB

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| In Re: | Proceedings Under Chapter 11 |
|---|---|
| SNOWFLAKE WHITE MOUNTAIN POWER, LLC, | Case No. 2:10-bk-21604-CGC |
| Debtor. | **COBANK, ACB'S MOTION TO EXCUSE TURNOVER OF THE RECEIVER** |

Pursuant to 11 U.S.C. § 543(d)(1), Secured Creditor CoBank, ACB ("**CoBank**") moves the Court to excuse the Receiver from turning over property of the estate to the debtor, Snowflake White Mountain Power, LLC (the "**Debtor**" or "**SWMP**"), because excusing the Receiver from turnover is in the best interests of the creditors. This Motion is supported by the following Memorandum of Points and Authorities.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  FACTS**

   **A.  THE LOAN TRANSACTION**

   1.  On or about September 8, 2006, CoBank provided credit facilities (collectively, the "**Loan**") to the Debtor, Renegy, LLC ("**Renegy**"), and Renegy Trucking, LLC ("**Renegy Trucking**") (collectively, the Debtor, Renegy, and Renegy Trucking are referred to as the "**Borrowers**") for, among other things, the development and operation of a 24 Megawatt biomass-fired power plant located near Snowflake, Arizona (hereinafter referred to as the "**Project**") and obtaining a hedge against variable interest rate risk.

///

11722766

2. The terms and conditions of the Loan are set forth in the "Amended and Restated Credit Agreement," as amended, dated as of January 1, 2009 by and among Borrowers and CoBank (the "**Credit Agreement**") and the "2002 Master Agreement", dated as of September 1, 2006, between CoBank and SWMP together with the related information dated September 8, 2006 (together, the "**Swap Agreement**"). All capitalized terms not otherwise defined herein have the same meaning as in the Credit Agreement. A true and correct copy of the Credit Agreement and Swap Agreement is attached hereto as **Exhibit 1**, and incorporated herein by this reference.

3. The Loan is evidenced by the Credit Documents, including the undertaking set forth in the Credit Agreement to reimburse CoBank for any draws under letters of credit issued by CoBank under the Credit Agreement, and by one or more Notes, as defined in the Credit Agreement (the "**Notes**"), which include but are not limited to: (i) that certain "Term Note" dated January 16, 2009 in the original maximum principal amount of $9,301,890, which was executed and delivered by Borrowers to CoBank; (ii) that certain "Renegy Term Note" dated September 8, 2006 in the original maximum principal amount of $1,492,123, which was executed and delivered by Borrowers to CoBank; (iii) that certain "Revolving Note" dated September 8, 2006 in the original maximum amount of $500,000, which was executed and delivered by Borrowers to CoBank; (iv) that certain "LC Loan Note" dated September 8, 2006 in the original maximum principal amount of $40,161,891, which was executed and delivered by Borrowers to CoBank; and (v) that certain "Additional Revolving Note" dated as of December 23, 2009 in the original maximum amount of $3,000,000, which was executed and delivered by Borrowers to CoBank. True and correct copies of the Notes are attached hereto as **Exhibits 2, 3, 4, 5,** and **6**, respectively, and incorporated herein by this reference.

4. The Loan is secured by, among other things, that certain "Security Agreement" (the "**Security Agreement**") dated as of September 1, 2006 and executed by

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

1  Borrowers and CoBank. A true and correct copy of the Security Agreement is attached
2  hereto as **Exhibit 7** and incorporated herein by this reference.

3  5. Pursuant to the Security Agreement, Borrowers granted CoBank a security interest in the "Collateral" as that term is defined in § 2.1 of the Security Agreement (the "**Collateral**"). CoBank perfected its security interest in the Collateral by, among other things, filing: (i) that certain "UCC Financing Statement" with the Arizona Secretary of State as File No. 200614430707 (the "**SWMP UCC**"); (ii) that certain "UCC Financing Statement" with the Arizona Secretary of State as File No. 200614430694 (the "**Renegy UCC**); and (iii) that certain "UCC Financing Statement" with the Arizona Secretary of State as File No. 200614430661 (the "**Renegy Trucking UCC**") (collectively, the "**UCCs**"), copies of which are attached hereto as **Exhibits 8, 9,** and **10**, respectively, and incorporated herein by this reference.

6. The Loan is also secured by that certain "Leasehold Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing" (the "**Deed of Trust**"), as amended, recorded as Instrument No. 2006-27366 in the Official Records of the Navajo County Recorder on September 8, 2006, which was executed by SWMP, as trustor, for the benefit of CoBank, as beneficiary, and grants CoBank a first priority and perfected security interest in the "Mortgaged Property" (the "**Mortgaged Property**") as defined in the Granting Clause of the Deed of Trust, which includes, but is not limited to, certain of SWMP's rights, privileges and benefits under that certain "Ground Lease Agreement," as modified, dated as of September 14, 2005 by and between SWMP and Abitibi Consolidated Sales Corp., now Catalyst Paper, Inc. (the "**Ground Lease**"). A true and correct copy of the Deed of Trust is attached hereto as **Exhibit 11**, and incorporated herein by this reference.

7. The Mortgaged Property includes the Project.

8. The Loan is also secured by that certain "Pledge Agreement" dated as of October 1, 2007 by and among Renegy Holdings, Inc. ("**Renegy Holdings**"), Renegy, Renegy Trucking, and SWMP on the one side, and CoBank on the other side, as amended

Snell & Wilmer
L.L.P.
LAW OFFICES
One Arizona Center, 400 E. Van Buren
Phoenix, Arizona 85004-2202
(602) 382-6000

11722766

by the "First Amendment to Pledge Agreement" dated as of January 1, 2009 (collectively, the "**Borrowers Pledge Agreement**"), a true and correct copy of which is attached hereto as **Exhibit 12**, and incorporated herein by this reference. Pursuant to the Borrowers Pledge Agreement, Borrowers and Renegy Holdings pledged, among other things, all of their membership interests in the Borrowers to CoBank (the "**Borrower Membership Interests**").

9. The Loan is also secured by that certain "Pledge Agreement" (the "**AZ Biomass Pledge Agreement**") dated as of January 1, 2009 by and among AZ Biomass and SWMP on the one side, and CoBank on the other side, a true and correct copy of which is attached hereto as **Exhibit 13** and incorporated herein by this reference. Pursuant to the AZ Biomass Pledge Agreement, AZ Biomass pledged, among other things, all of their Class A Interest (as defined in the AZ Biomass Pledge Agreement) in SWMP to CoBank (the "**AZ Biomass Membership Interests**").

### B. THE DEFAULTS

10. By letter dated October 27, 2009, Catalyst notified Borrowers that a default had occurred under the Ground Lease due to, among other things, the Borrowers' failure to make payments when due (generally, the "**Catalyst Default**"). A true and correct copy of the October 27, 2009 letter is attached hereto as **Exhibit 14**, and incorporated herein by this reference.

11. Despite demand, the Borrowers failed to cure the defaults under the Ground Lease. By failing to cure the defaults under the Ground Lease, the Borrowers jeopardized CoBank's interest in the collateral, and caused Events of Default to occur under §§ 5.16.1 and 8.1.5(b) of the Credit Agreement.

12. On or about December 4, 2009, pursuant to § 8.2 of the Credit Agreement, CoBank cured the Catalyst Default by paying $525,501.06 to Catalyst.

13. By letter dated December 4, 2009, CoBank notified the Borrowers that it cured the Catalyst Default, and gave the Borrowers notice that they had violated several other provisions of the Credit Agreement, including, but not limited to, §§ 5.5.1, 5.8.2,

11722766

- 4 -

5.8.8, 5.15.3, 5.16.1, 5.22, and 8.1.5(a) of the Credit Agreement (collectively, the "**Subject Events of Default**"). A true and correct copy of the December 4, 2009 letter is attached hereto as **Exhibit 15**, and incorporated herein by this reference.

14. In addition, SWMP defaulted on its obligations to CoBank by failing to make the following payments: (a) on December 31, 2009, an interest payment in the amount of $2,386.42 due under the Term Loan; (b) on January 4, 2010, a principal payment in the amount of $423,872.50 due under the Term Loan; (c) on January 4, 2010, an interest payment in the amount of $33,020.53 due under the Term Loan; (d) on January 4, 2010, a principal payment in the amount of $82,270.09 due under the Renegy Term Loan; (e) on January 4, 2010, an interest payment in the amount of $21,491.33 due under the Renegy Term Loan; and (f) on December 31, 2009, an interest payment in the amount of $1,698.63 due under the Revolving Loan (collectively, the "**Loan Payment Defaults**").

### C. THE LOAN MODIFICATION

15. On or about December 23, 2009, SWMP, Renegy, Renegy Trucking, and CoBank executed that certain "Forbearance Agreement" dated as of December 23, 2009 (the "**Forbearance Agreement**"), a true and correct copy of which is attached hereto as **Exhibit 16** and incorporated herein by this reference.

16. To protect the value of its collateral, CoBank, in connection with the Forbearance Agreement, agreed to extend additional credit to the Borrowers in connection with the Forbearance Agreement.

17. Accordingly, on or about December 28, 2009, SWMP executed and delivered that certain "First Amendment to Amended and Restated Credit Agreement" dated as of December 28, 2009 (the "**Credit Agreement Amendment**"), which established the Additional Revolving Loan Facility, as defined in § 2.1.11 of the Credit Agreement Amendment, and executed and delivered the "Additional Revolving Note" (the "**Additional Revolving Note**") dated as of December 23, 2009 in the original maximum principal amount of $3,000,000. A true and correct copy of the Credit

11722766

- 5 -

Agreement Amendment (without exhibits) is hereto as **Exhibit 17**, and incorporated herein by this reference. The Additional Revolving Note is attached as Exhibit 6 hereto.

18. Pursuant to its own terms the Additional Revolving Note matured and was due and owing in full on March 29, 2010. In addition, the Forbearance Period, as defined in § 3(b) of the Forbearance Agreement, expired on March 29, 2010.

19. Borrowers failed to repay the Additional Revolving Note on or before March 29, 2010 and, therefore, caused an additional Event of Default to occur under § 8.1.1 of the Credit Agreement (the "**Maturity Default**").

### D. TERMINATION OF THE FORBEARANCE PERIOD

20. By letter dated March 30, 2010, CoBank gave Borrowers notice that, among other things: (i) the Forbearance Period had expired on March 29, 2010; (ii) CoBank intended to seek the appointment of a Receiver on or about April 5, 2010; (iii) the Additional Revolving Note had matured and was due and owing in full; and (iv) demand was made for Borrowers to cure all existing defaults under the Loan. A true and correct copy of the March 30, 2010 letter is attached hereto as **Exhibit 18**, and incorporated herein by this reference.

21. Pursuant to § 4(d) the Forbearance Agreement, the Borrowers agreed to both the form and content of a "Stipulated Order Appointing Receiver" (the "**Stipulated Receivership Order**") that CoBank could, among other things, have entered by the Court upon termination of the Forbearance Period.

22. As of April 1, 2010, the total amount owed under the Loan was no less than $11,787,266.26, which is made up of $11,257,887.93 in principal, $123,099.18 in interest ($3,517.42 per diem), and $406,279.15 in fees, plus accrued and accruing default interest, late charges, loan fees, trustee's fees, attorneys' fees, and costs (the "**Indebtedness**").[1]

///

---

[1] Additionally, CoBank has issued that certain "Irrevocable Letter of Credit" dated September 7, 2006 in the stated amount of $40,161,891 as security for tax-exempt bonds issued by The Industrial Development Authority of the City of Show Low, Arizona. The Borrowers will ultimately be obligated to pay CoBank if and when the letter of credit is drawn upon. CoBank reserves the right to seek judgment on the amounts that may be, or become, due under the letter of credit at a later date.

11722766

### E. THE RECEIVERSHIP

23. On April 5, 2010, CoBank filed a "Verified Complaint For: (1) Breach of Credit Documents; and (2) Appointment of a Receiver" (the "**Complaint**") in the Superior Court of Arizona, in and for the County of Maricopa as Case No. CV2010-010974 (the "**State Court Action**"), along with a "Verified Application for the Appointment of a Receiver" (the "**Application**") and supporting "Affidavit in Support of Appointment of a Receiver" (the "**Affidavit**").

24. Also on April 5, 2010, the State Court entered that certain "Stipulated Order Appointing Receiver" (the "**Receivership Order**"), and appointed David M. Reaves of the Reaves Law Group, P.C. as the Receiver (the "**Receiver**") over the "Property," as that term is defined in the Receivership Order. A true and correct copy of the Receivership Order is attached hereto as **Exhibit 19**, and incorporated herein by this reference.

### F. SWMP'S AGREEMENT WITH SALT RIVER PROJECT

25. The Debtor sells the power it generates to, among others, Salt River Project Agricultural Improvement and Power District ("**SRP**"). The terms and conditions of the arrangement are memorialized by that certain "Second Amended and Restated Renewable Energy Purchase and Sale Agreement" ("**Power Agreement**") dated as of August 18, 2006 by and between SWMP and SRP. A true and correct copy of the Power Agreement is attached hereto as **Exhibit 20**.

26. On May 14, 2010, SRP, the Receiver, and CoBank stipulated to amend the Receivership Order. In the process of negotiating the stipulation, the Receiver and CoBank specifically asked SRP whether there were any outstanding defaults under the Power Agreement. A copy of the email correspondence between CoBank's and SRP's counsel is attached as **Exhibit 21**.

27. By letter dated May 24, 2010, SRP noticed an alleged default under § 1.4 of the "Consent and Agreement" dated September 1, 2006 by and among SRP and CoBank. A copy of the May 24, 2010 letter is attached hereto as **Exhibit 22**.

11722766

- 7 -

28. By letter dated June 4, 2010, SRP noticed another alleged default under § 15(I)(ii) of the Power Agreement. A copy of the June 4, 2010 is attached hereto as **Exhibit 23**.

29. By letter dated June 14, 2010, SRP noticed another alleged default for the failure to deliver a certain amount of power for Year Two of the Power Agreement. A copy of the June 14, 2010 letter is attached hereto as **Exhibit 24**.

30. By letter dated June 15, 2010, the Receiver and CoBank objected to SRP's letters. A copy of the June 15, 2010 letter is attached hereto as **Exhibit 25**.

31. Notwithstanding ongoing negotiations that the Receiver and CoBank undertook in good faith with SRP, by letter dated July 9, 2010, SRP noticed that they would terminate the Power Agreement effective 11:59:59 p.m. on July 9, 2010. A copy of the July 9, 2010 termination letter is attached hereto as **Exhibit 26**.

32. On July 9, 2010, the Receiver and CoBank filed an "Application for Temporary Restraining Order Against Salt River Project Agricultural Improvement and Power District or in the alternative, for Authority of the Receiver to File a Voluntary Petition for Chapter 11 Bankruptcy for Snowflake White Mountain Power, LLC" in the State Court Action.

33. Also on July 9, 2010, the State Court entered an "Order Authorizing the Receiver to File a Chapter 11 Petition on Behalf of Snowflake White Mountain Power, LLC" (the "**Bankruptcy Order**"), which granted the Receiver the authority to file a voluntary petition for chapter 11 bankruptcy. A true and correct copy of the Bankruptcy Order is attached hereto as **Exhibit 27**, and incorporated herein by this reference.

### F. THE RECEIVER SHOULD REMAIN IN POSSESSION AND CONTROL OF THE PROPERTY

34. Since his appointment in April 2010, the operations at the power plant have improved. For example, the plant exceeded its output power projections for the months of May and June 2010. The SWMP managers replaced by the Receiver failed to meet power output expectations.

11722766

35. In addition to the plant's operational improvements, the Receiver has already engaged Ewing Bemiss & Co. ("**EB&Co**"), an investment banking firm, to market and sale the property. The sale process is underway, and EB&Co. has already received several bids from interested purchasers. Removing the Receiver from this process would be detrimental to the sale process and, ultimately, detrimental to the creditors.

## II. LEGAL ARGUMENT

### A. THIS COURT HAS THE DISCRETIONARY AUTHORITY TO EXCUSE TURNOVER

Although Section 543(b) obligates the Receiver to turnover the Property to the Debtor, Section 543(d)(1) of the Bankruptcy Code gives this Court the discretion to excuse compliance with certain aspects of Section 543. *See* 5A Fed. Proc. L. Ed. § 9:985 (2010). Section 543(d)(1) provides that "[a]fter notice and hearing, the bankruptcy court may excuse compliance with subsection (a), (b), or (c) of this section if the interests of creditors and, if the debtor is not insolvent, of equity security holders would be better served by permitting a custodian to continue in possession, custody, or control of such property." In other words, if the creditors of the estate would be better served by the Receiver than management, then this Court may excuse the turnover requirements. Here, the estate would be better served by keeping the Receiver in place because: (i) the operations of the power plant have improved over the last three months; and (ii) the Receiver has initiated the process of selling the Property. The Debtor's old management could not complete the sale process as effectively as the Receiver – which would be a detriment to the creditors of the estate.

### B. THIS SITUATION SATISFIES BOTH FACTORS CONSIDERED BY BANKRUPTCY COURTS WHEN DECIDING WHETHER TO EXCUSE TURNOVER

When deciding whether to excuse turnover, "Courts consider factors including whether there will be sufficient income to fund a successful reorganization and whether

11722766

- 9 -

there has been mismanagement by the Debtor." *In re Uno Broadcasting Corporation*, 167 B.R. 189, 200 (Bankr. D. Ariz. 1994). This situation satisfies both factors.

First, the Receiver was put in place to manage the finances of the Debtor and to maintain the power plant as a going concern to maximize the value of the Property for SWMP's creditors. To date, the Receiver "has been proceeding expeditiously and professionally to manage the affairs of the Debtor," *Id.*, and it appears as though the Debtor can continue to operate as a going concern for the time being due, in part, to the replacement of the Debtor's old management with the Receiver. Moreover, to the extent any operational shortfalls need to be advanced to continue operating the power plant, "[CoBank] is more likely to cooperate in that regard with [the] Receiver in place." *In re Foundry of Barrington P'ship*, 129 B.R. 550, 558 (Bankr. N.D. Ill. 1991) (excusing receiver from turnover). Accordingly, whether there will be sufficient income for reorganization depends upon the continued presence of the Receiver.

Second, there was at least enough evidence of mismanagement by the Debtor's old management to justify the appointment of a Receiver in the State Court Action. *In re Uno Broadcasting Corporation*, 167 B.R. at 201. Although CoBank does not believe at this time that the Debtor's old management engaged in any wrongdoing or bad-faith, it is clear that the change in possession and control has benefitted the power plant. Having satisfied both factors, this Court should enter an order excusing the Receiver from complying with 11 U.S.C. §§ 543(a), (b), and (c).

### C. **PENDING RESOLUTION OF THIS MOTION, THE RECEIVER IS AUTHORIZED TO RETAIN POSSESSION AND CONTROL OF THE PROPERTY**

It is well established that "[i]f a motion is timely filed by an interested party to excuse compliance with the turnover provisions [of Section 543], then pending a hearing, the custodian may retain possession." *See* 5A Fed. Proc. L. Ed. § 9:985 (citing *In re Watkins*, 63 B.R. 46 (Bankr. D. Colo. 1986)). Accordingly, pending resolution of this Motion, the Receiver shall continue to operate, possess, and control the Property.

11722766

### III. CONCLUSION

For the foregoing reasons, this Court should exercise its discretionary authority to excuse the Receiver from complying with 11 U.S.C. §§ 543(a), (b), and (c). CoBank reserves the right to supplement this motion prior to any hearing.

DATED this 9th day of July, 2010.

SNELL & WILMER L.L.P.

By: /s/ Benjamin W. Reeves
Donald L. Gaffney
Benjamin W. Reeves
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2202
Attorneys for CoBank, ACB

**ORIGINAL** of the foregoing e-filed with the Clerk of Court this 9th day of July, 2010, with **COPIES** e-mailed or mailed to:[2]

SNOWFLAKE WHITE MOUNTAIN POWER, LLC
c/o CT Corporation System
2394 E. Camelback Road
Phoenix, AZ 85016

David M. Reaves
2929 N. 44th Street, Suite 600
Phoenix, AZ 85018
*dreaves@reaves-law.com*

/s/ Benjamin W. Reeves

---

[2] CoBank will serve copies of this Motion on the appropriate parties as soon as it obtains sufficient information from the Debtor to enable it to create a service list. After such service, CoBank will file a certificate of service.

11722766

- 11 -