# ASSET PURCHASE AGREEMENT

between

**DAVID M. REAVES**
as
**Authorized Representative of**
**SNOWFLAKE WHITE MOUNTAIN POWER, LLC**

and

**SNOWFLAKE POWER, LLC**

**September 9, 2010**

SF\762717.4

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ....................................................................................................2

    1.1    Certain Definitions................................................................................................2

ARTICLE II SALE AND PURCHASE OF ASSETS.............................................................7

    2.1    Sale and Purchase of Assets; Assumption of Obligations ...................................7
    2.2    Purchase Price....................................................................................................10
    2.3    Procedures for Assumption and Assignment of Agreements ..............................10
    2.4    Apportionments..................................................................................................11

ARTICLE III CLOSING .....................................................................................................11

    3.1    Closing...............................................................................................................11
    3.2    Termination........................................................................................................12
    3.3    Effect of Termination.........................................................................................12

ARTICLE IV ACTIONS PRIOR TO THE CLOSING DATE ..............................................13

    4.1    Investigation by Buyer .......................................................................................13
    4.2    Conduct of Business ..........................................................................................13
    4.3    Additional Obligations.......................................................................................14
    4.4    Confidentiality ...................................................................................................14
    4.5    Employment Arrangements ................................................................................14
    4.6    Insurance............................................................................................................15
    4.7    Qualification in Arizona .....................................................................................15

ARTICLE V REPRESENTATIONS AND WARRANTIES OF RECEIVER ............................16

    5.1    Authority, Approval and Enforceability .............................................................16
    5.2    Title to Purchased Assets ...................................................................................16
    5.3    No Consents.......................................................................................................16
    5.4    Legal Compliance ..............................................................................................16
    5.5    Financial Statements ..........................................................................................17
    5.6    No Proceedings..................................................................................................17
    5.7    Permits ..............................................................................................................18
    5.8    Litigation...........................................................................................................18
    5.9    Absence of Changes...........................................................................................18
    5.10   Locations of Business ........................................................................................18
    5.11   Employees..........................................................................................................18
    5.12   Key Financial Information; Recent Reports ........................................................19
    5.13   Real Property .....................................................................................................19
    5.14   Contracts ...........................................................................................................19
    5.15   Insurance ...........................................................................................................20
    5.16   Taxes.................................................................................................................20
    5.17   No Other Representations or Warranties ............................................................20

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF BUYER...................................20

    6.1    Existence and Qualification ....................................................................20
    6.2    Authority, Approval and Enforceability ................................................20
    6.3    No Default or Consents...........................................................................21
    6.4    No Proceedings .......................................................................................21
    6.5    Financial Advisors ..................................................................................21
    6.6    Financial Capability ...............................................................................21
    6.7    No Other Representations .......................................................................22
    6.8    Condition of Business.............................................................................22

ARTICLE VII CONDITIONS TO PARTIES' OBLIGATIONS .........................................22

    7.1    Conditions to Obligations of the Receiver.............................................22
    7.2    Conditions to Obligations of Buyer .......................................................23

ARTICLE VIII BANKRUPTCY COURT MATTERS .......................................................24

    8.1    Sale Motion; Sale Order..........................................................................24

ARTICLE IX TAXES...........................................................................................................26

    9.1    Transfer Taxes ........................................................................................26
    9.2    Purchase Price Allocation .......................................................................26

ARTICLE X MISCELLANEOUS ........................................................................................27

    10.1    Nonsurvival of Representations, Warranties and Covenants..................27
    10.2    Injunctive Relief.....................................................................................27
    10.3    Further Assurances..................................................................................27
    10.4    Expenses .................................................................................................27
    10.5    Notices ....................................................................................................27
    10.6    Status of Receiver ...................................................................................28
    10.7    Governing Law .......................................................................................28
    10.8    Submission to Jurisdiction; Consent to Service of Process ...................28
    10.9    Entire Agreement; Amendments and Waivers .......................................29
    10.10    Release....................................................................................................29
    10.11    Binding Effect and Assignment; Severability; Bankruptcy Court Approval........29
    10.12    Multiple Counterparts ............................................................................30
    10.13    References and Construction ..................................................................30

## LIST OF EXHIBITS

**Exhibit A**          **Form of Assignment and Assumption Agreement**

**Exhibit B**          **Form of Bill of Sale**

**Exhibit C**          **Sale Procedures**

**Exhibit D**          **Requested Form of Sale Order**

## SCHEDULES

Schedule 2.1(a)(v)      Purchased Contracts
Schedule 2.1(c)(iv)     Employees and Compensation
Schedule 2.4(a)         Current Assets and Current Liabilities as of July 31, 2010
Schedule 4.2(c)         Equipment to Order for November Outage at Buyer's Option
Schedule 5.2            Plant Equipment
Schedule 5.3            Consents
Schedule 5.7            Permits
Schedule 5.13           Real Property
Schedule 5.14           Contracts (other than leases)
Schedule 5.15           Insurance

SF\762717.4

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is made and entered into as of September 9, 2010 (the "**Effective Date**") by and between SNOWFLAKE POWER, LLC, a Delaware limited liability company ("**Buyer**"), and DAVID M. REAVES, in his capacity as authorized representative (the "**Receiver**") for Snowflake White Mountain Power, LLC, an Arizona limited liability company (the "**Company**").

WHEREAS, the Company operates a 24-megawatt (nameplate) biomass-fired power plant (the "**Plant**") located in Snowflake, Arizona (the "**Business**");

WHEREAS, on April 5, 2010, CoBank, a secured creditor of the Company, filed suit against the Company and certain other parties in the Superior Court of the State of Arizona (the "**Receivership Court**"), in case number CV2010-010974, which suit (the "**Receivership Case**") included an application for the appointment of the Receiver as receiver over certain assets of the Company (as further defined in the Receivership Order, the "**Property**"), and pursuant to which a Stipulated Order Appointing Receiver ("**Receivership Order**") was entered by the Receivership Court on April 7, 2010;

WHEREAS, on July 9, 2010, the Debtor and CoBank filed an "Application for Temporary Restraining Order Against Salt River Project Agricultural Improvement and Power District or in the alternative For Authority of the Receiver to File a Voluntary Petition for Chapter 11 Bankruptcy for Snowflake White Mountain Power, LLC" (the "**Application**") in the Receivership Case;

WHEREAS, on July 9, 2010, the Receivership Court entered an "Order Authorizing the Receiver to File a Chapter 11 Petition on Behalf of Snowflake White Mountain Power, LLC" (the "**State Court Order**"), which denied the application for a temporary restraining order, but granted the Receiver authority to file a bankruptcy petition for the Debtor;

WHEREAS, on July 9, 2010, the Receiver filed a Voluntary Petition for Chapter 11 Bankruptcy in the United States District Court, District of Arizona (the "**Bankruptcy Court**") on behalf of Snowflake White Mountain Power, LLC, commencing Bankruptcy Case No. 2:10-21694-CGC (the "**Bankruptcy Case**");

WHEREAS, On July 13, 2010, the Bankruptcy Court granted "CoBank's Motion to Excuse Turnover of the Receiver" on an interim basis ("**Excuse Order**"), authorizing the Receiver to continue to operate, possess, and control the Property pending further order of the Bankruptcy Court;

WHEREAS, pursuant to the Receivership Order and the Excuse Order, the Receiver is authorized to sell or otherwise dispose of the Property, subject to further Bankruptcy Court approval;

WHEREAS, the Receiver desires to sell, transfer and assign to Buyer the Purchased Assets (as defined below), and Buyer desires to purchase from the Receiver the Purchased Assets, in each case upon the terms and subject to the conditions contained in this Agreement; and

WHEREAS, the Receiver intends to file motions with the Bankruptcy Court seeking approval of the sale of the Purchased Assets to Buyer;

NOW, THEREFORE, in consideration of the mutual covenants, representations, and undertakings in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

### 1.1 Certain Definitions

For purposes of this Agreement, the following terms shall have the meanings in this Section 1.1:

"**Accounts Payable**" means the accounts payable of the Business arising from the operation of the Business prior to the Closing Date.

"**Accounts Receivable**" means the bona-fide accounts receivable of the Business, but does not include any doubtful or past due accounts.

"**Agreement**" means this Agreement.

"**Application**" shall have the meaning ascribed to it in the recitals.

"**APS**" means Arizona Public Service Company.

"**Asset Acquisition Statement**" shall have the meaning ascribed to it in Section 9.2.

"**Assignment and Assumption Agreement**" means the Assignment and Assumption Agreement substantially in the form attached as Exhibit A.

"**Assumed Liabilities**" shall have the meaning ascribed to it in Section 2.1(c).

"**Bankruptcy Case**" shall have the meaning ascribed to it in the recitals.

"**Bankruptcy Court**" shall have the meaning ascribed to it in the recitals.

"**Bill of Sale**" means the Bill of Sale substantially in the form attached as Exhibit B.

"**Business**" shall have the meaning ascribed to it in the recitals.

"**Business Day**" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"**Buyer**" shall have the meaning ascribed to it in the preamble.

"**Buyer Documents**" shall have the meaning ascribed to it in Section 6.2.

"**Buyer Releasing Parties**" shall have the meaning ascribed to it in Section 10.10.

"**Buyer's Officer's Certificate**" shall have the meaning ascribed to it in Section 7.1(f)(iii).

"**Catalyst**" means Catalyst Paper (Snowflake) Inc.

"**Catalyst Lease**" means the Lease Agreement, dated as of September 1, 2005, between Abitibi Consolidated Sales Corp. and the Company, as amended by Section 3 of the Consent and Agreement, dated as of September 1, 2006, among Abitibi Consolidated Sales Corp., the Company and CoBank, as Collateral Agent, Amendment No. 2 to Lease Agreement, dated as of August 2, 2007, between Abitibi Consolidated Sales Corp. and the Company, Amendment No. 3 to Lease Agreement, dated as of August 23, 2007, between Abitibi and the Company, Section 1(b) of the First Amendment to Consent and Agreement, dated as of April 10, 2008, between Catalyst and the Company, as assigned to Catalyst pursuant to that certain Assignment and Assumption Agreement, dated as of April 10, 2008 between Abitibi Consolidated Sales Corp. and Catalyst and Amendment No. 4 to Lease Agreement, dated as of December 31, 2008, between Catalyst and the Company.

"**Closing**" shall have the meaning ascribed to it in Section 3.1.

"**Closing Apportionments**" shall have the meaning ascribed to it in Section 2.4.

"**Closing Date**" shall have the meaning ascribed to it in Section 3.1.

"**Closing Fuel Stockpile**" shall have the meaning ascribed to it in Section 2.4(c).

"**CoBank**" means CoBank, ACB.

"**Company**" shall have the meaning ascribed to it in the preamble.

"**Company Insurance Policies**" shall have the meaning ascribed to it in Section 4.6.

"**Confidentiality Agreement**" means the Confidentiality Agreement dated August 31, 2010 between the Receiver and Buyer.

"**Current Assets**" means Accounts Receivable, deposits, prepayments, refunds, pre-paid costs, cash and cash equivalents, but does not include any Excluded Assets.

"**Current Liabilities**" means Accounts Payable, accrued expenses, and accrued Liabilities for salaries, benefits and other compensation owed to Employees.

"**Deposit Amount**" shall have the meaning ascribed to it in Section 2.2(b).

"**Effective Date**" shall have the meaning ascribed to it in the preamble.

"**Employees**" means those individuals who are currently employed exclusively in the conduct of the Business.

"**Environmental Laws**" shall have the meaning ascribed to it in Section 5.4(a).

"**Environmental Permits**" shall have the meaning ascribed to it in Section 5.4(a).

"**Excluded Assets**" shall have the meaning ascribed to it in Section 2.1(b).

"**Excluded Assets**" shall have the meaning ascribed to it in Section 2.1(b).

"**Excuse Order**" shall have the meaning ascribed to it in the recitals.

"**Financial Statements**" shall have the meaning ascribed to it in Section 5.5(a).

"**Future Forest**" means Future Forest, LLC, an Arizona limited liability company.

"**Future Forest Contract** " means the Sales Agreement, dated as of February 26, 2010, between Future Forest and the Company.

"**GAAP**" means generally accepted accounting principles as in effect in the United States from time to time.

"**Governmental Body**" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private), and shall include the Court.

"**Knowledge**" means the actual knowledge of the Receiver without any independent factual verification or investigation of any kind.

"**Liability**" shall mean any debt, liability, commitment or other obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or not yet due) and including all costs, fees and expenses relating thereto.

"**Lien**" means any lien, encumbrance, pledge, mortgage, deed of trust, interest, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement, or transfer restriction under any shareholder or similar agreement.

"**Material Adverse Effect**" means any circumstance, occurrence, event or change that has or would be reasonably expected to have a material adverse effect on (a) the Purchased Assets or the Business taken as a whole, or (b) the ability of the Receiver to timely satisfy and perform its obligations under this Agreement and consummate the transactions contemplated hereby, and shall specifically include any destruction of the fuel stockpile which prevents the Business from operating, after taking into account the Company's ability to acquire fuel currently and replenish the stockpile; provided, however, that in no event shall any of the following be deemed to constitute, nor shall any of the following be taken into account in determining whether there has been or shall be, a Material Adverse Effect: (i) general economic or business conditions or changes therein, including changes in interest or currency rates, or acts of war, civil unrest or terrorism; (ii) any occurrence or condition generally affecting the industry in which the Business operates, including any change in such conditions; (iii) any occurrence or

4

condition arising out of the announcement of the transactions described in this Agreement or the performance of the transactions contemplated hereby (including any occurrence or condition arising out of the identity of or facts relating to Buyer); (iv) any effect or result of a breach of this Agreement by Buyer; or (v) changes in GAAP or the interpretation thereof, or any applicable law or the interpretation thereof.

"**Notice**" shall have the meaning ascribed to it in Section 10.5.

"**Ordinary Course of Business**" means (a) with respect to any period before April 5, 2010, the ordinary and usual course of normal day-today operations of the Business, taking into account, where applicable, the deteriorating financial condition of the Company prior to the filing of the Receivership Case and (b) with respect to any period after April 5, 2010, the ordinary and usual course of normal day-today operations of the Business as conducted by the Company through the Effective Date, taking into account, where applicable, the Receivership Case, the funding limitations imposed on the Receiver and the reasonably anticipated effects thereof.

"**Outside Date**" shall mean November 12, 2010.

"**Party**" means each of the Receiver and Buyer.

"**Permits**" means any approvals, permits, orders, authorizations, consents, franchises, registrations, licenses, permits, variances or certificates of a Governmental Body.

"**Permitted Exceptions**" means (a) liens for Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings, provided an appropriate reserve has been established therefor in accordance with GAAP; (b) mechanics', carriers', workers', and repairers' Liens arising or incurred in the Ordinary Course of Business for amounts not yet due; (c) zoning, entitlement and other land use and environmental regulations by any Governmental Body, provided that such regulations have not been violated, and (d) imperfections or limitations in title which are not, individually or in the aggregate, material.

"**Person**" means and includes an individual, a partnership, a joint venture, a limited liability company, a corporation or trust, an unincorporated organization, a group, or a government or other department or agency thereof, or any other entity.

"**Plant**" shall have the meaning ascribed to it in the recitals.

"**Procedures Motion**" shall have the meaning ascribed to it in Section 8.1(a).

"**Property**" shall have the meaning ascribed to it in the recitals.

"**Property Tax**" means any real property, personal property or similar ad valorem Taxes.

"**Purchase Price**" shall have the meaning ascribed to it in Section 2.2.

"**Purchased Assets**" shall have the meaning ascribed to it in Section 2.1(a).

"**Purchased Contracts**" shall have the meaning ascribed to it in Section 2.1(a)(v).

"**Purchased Permits**" shall have the meaning ascribed to it in Section 2.1(a)(xi).

"**Real Property**" means the real property leased by the Company under the Catalyst Lease.

"**Receiver**" shall have the meaning ascribed to it in the preamble.

"**Receiver's Certificate**" shall have the meaning ascribed to it in Section 7.2(j)(iii).

"**Receivership Case**" shall have the meaning ascribed to it in the recitals.

"**Receivership Court**" shall have the meaning ascribed to it in the recitals.

"**Receivership Order**" shall have the meaning ascribed to it in the recitals.

"**Requested Form of Sale Order**" shall have the meaning ascribed to it in Section 8.1(a).

"**Revised Statements**" shall have the meaning ascribed to it in Section 9.2.

"**Sale**" means the consummation of the transactions contemplated hereby to occur at the Closing.

"**Sale Documents**" means this Agreement, the Bill of Sale and the Assignment and Assumption Agreement.

"**Sale Hearing**" means the Bankruptcy Court hearing to consider the Sale Motion.

"**Sale Motion**" shall have the meaning ascribed to it in Section 8.1(a).

"**Sale Order**" shall have the meaning ascribed to it in Section 8.1(b).

"**Sale Procedures**" shall have the meaning ascribed to it in Section 8.1(a).

"**State Court Order**" shall have the meaning ascribed to it in the recitals.

"**Target Fuel Stockpile**" shall have the meaning ascribed to it in Section 2.4(c).

"**Tax**" or "**Taxes**" means all taxes or other charges, fees or assessments in the nature of a tax, including all net income, franchise, profits, gross receipts, capital, sales, use, ad valorem, value added, transfer, transfer gains, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, real or personal property, and estimated taxes, together with any interest and any penalties, fines, additions to tax or additional amounts thereon, imposed by any taxing authority (federal, state, local or foreign).

"**Tax Returns**" means all returns, declarations, reports, forms, estimates, information returns and statements required to be filed with a taxing authority in connection with any Taxes.

6

"**Termination Date**" shall have the meaning ascribed to it in Section 3.2.

"**Transfer Taxes**" shall have the meaning ascribed to it in Section 9.1.

"**Transferred Employee**" means any Employee who accepts an offer of employment with Buyer prior to, on or after the Closing Date.

## ARTICLE II
## SALE AND PURCHASE OF ASSETS

**2.1    Sale and Purchase of Assets; Assumption of Obligations**

(a)    <u>Sale and Purchase of Assets</u>.  On the terms and subject to the conditions herein expressed, the Receiver agrees to sell, convey, transfer, assign, set over and deliver to Buyer on the Closing Date, and Buyer agrees to purchase and accept, all of the right, title and interest in and to all assets, properties and interests of the Company relating to the Business of every kind, character and description, whether tangible, intangible, real, personal or mixed, wherever located, other than the Excluded Assets (each and all of the foregoing, the "**Purchased Assets**"), including the following:

(i)    all deposits, prepayments, refunds, or pre-paid costs, fees, premiums and expenses;

(ii)    all tangible personal property used in the Business and located at the Real Property;

(iii)    the rights to and in the telephone numbers, internet web sites and internet domain names presently used by the Company in the Business and all software and software licenses used solely in the Business to the extent transferable;

(iv)    all financial and business records, including customer lists and files and data and databases (whether in print, electronic, or other format) primarily relating to the Business and personnel records of Transferred Employees, to the extent not included among the Excluded Assets;

(v)    all contracts listed on <u>Schedule 2.1(a)(v)</u> (the "**Purchased Contracts**"), provided that at any time prior to five business days prior to the anticipated Closing, Buyer in its sole discretion may, by notice to the Receiver, elect to remove from <u>Schedule 2.1(a)(v)</u> any contract listed on such schedule, other than the Master Power Purchase & Sale Agreement with Arizona Public Service Company, and any Transaction (as defined therein) effected thereunder, and the removed contract shall no longer be a Purchased Contract and instead shall become an Excluded Asset;

(vi)    all fuel inventory and spare parts;

(vii)    all patents, patent applications, patent rights, trademarks, trademark applications, trade names, product names, service marks, copyrights, copyright

7

applications domain name registration, know-how and other intellectual property related to the Business;

(viii)    all goodwill with respect to the Purchased Assets and the Business;

(ix)    all insurance benefits (including rights and proceeds thereof) (A) to the extent primarily relating to any damage to or destruction or other loss of any of the Purchased Assets or the Business, in any such case occurring from and between the Effective Date and the Closing Date, whether received or receivable by or on behalf of the Company on or after the Effective Date, unless expended on repairing or replacing any such Purchased Asset before the Closing Date, and (B) paid or payable under the Company Insurance Policies;

(x)    all claims of the Company against any Person primarily relating to the Purchased Assets or the Business;

(xi)    all Permits relating to the Business to the extent transferable (the **"Purchased Permits"**);

(xii)    all cash, cash equivalents and uncashed checks in favor of the Company received prior to the Closing Date; and

(xiii)    all Accounts Receivable outstanding as of the Closing and any other Current Assets not expressly set forth above.

(b)    Excluded Assets.  The following assets, properties and interests of the Company are excluded from the Purchased Assets, and the Company shall retain all right, title and interest in and to all such assets, properties and interests (collectively, the **"Excluded Assets"**):

(i)    all rights of the Company with respect to tax refunds, claims for tax refunds and tax attributes;

(ii)    all Tax Returns, tax and financial records, charter documents, corporate stock record books, minute books and corporate seals of the Company;

(iii)    all rights of the Company (if any) under this Agreement;

(iv)    all insurance policies other than any benefits thereof (including rights and proceeds thereof) (A) to the extent primarily relating to any damage to or destruction or other loss of any of the Purchased Assets or the Business, in any such case occurring from and between the Effective Date and the Closing Date, whether received or receivable by or on behalf of the Company on or after the Effective Date, unless expended on repairing or replacing any such Purchased Asset before the Closing Date, and (B) paid or payable under the Company Insurance Policies;

(v)    all bank accounts;

(vi)    all letters of credit; and

8

(vii)   any contract on Schedule 2.1(a)(v) that is removed by Buyer as provided in Section 2.1(a)(v).

(c)   Assumption of Assumed Liabilities.  On the terms and subject to the conditions herein expressed, Buyer shall assume and thereafter will pay, perform and discharge in accordance with their respective terms, as and when due, the following (collectively, the "**Assumed Liabilities**") that are specifically listed on a Schedule to this Agreement:

(i)   subject to Section 8.1(c), the Liability under the Purchased Contracts and Purchased Permits arising after the Closing Date;

(ii)   the Liability related to Taxes of the Business for any period from and after the Closing Date;

(iii)   Accounts Payable and accrued expenses outstanding as of the Closing Date, but only to the extent of the nature of those set forth on Schedule 2.4 (*i.e.*, the same payee or nature of payee; amounts may, and probably will, differ from amounts shown on the schedule); and

(iv)   the accrued Liability as of the Closing Date for salaries, benefits and other compensation owed to those Employees set forth on Schedule 2.1(c)(iv) or other Employees engaged after July 31 in the ordinary course of business consistent with this Agreement.

(d)   Excluded Liabilities.  Buyer shall not assume any Liabilities of the Company of any nature that are not Assumed Liabilities.  Without limiting the generality of the foregoing, Buyer shall not assume any of the following:

(i)   any Liability of the Company for Taxes of the Business for any period prior to the Closing Date, except as otherwise provided in this Agreement;

(ii)   any Liability under the Credit Agreement among the Company, certain affiliates of the Company, CoBank and the financial institutions party thereto, dated September 1, 2006;

(iii)   any Liability under the Second Amended and Restated Renewable Energy Purchase and Sale Agreement, dated as of August 18, 2006, between the Company and Salt River Project Agricultural Improvement and Power District; and

(iv)   any Liability related to the $39,250,000 Industrial Development Authority of the City of Show Low, Arizona Solid Waste Disposal Revenue Bonds.

(e)   Instruments of Transfer.  The sale, conveyance, transfer, assignment and delivery by the Receiver of the Purchased Assets to Buyer, and Buyer's purchase, receipt and acceptance thereof in accordance with this Section 2.1, shall be effected on the Closing Date by the execution and delivery by the Receiver of the Bill of Sale and by the Receiver and Buyer of the Assignment and Assumption Agreement.

9

**2.2     Purchase Price**

(a)     The consideration to be paid by Buyer to the Receiver for the Purchased Assets (the "**Purchase Price**") will be the sum of $4,750,000 plus the assumption of the Assumed Liabilities; provided, however, that the Purchase Price shall be subject to an adjustment for Closing Apportionments as determined in Section 2.4.

(b)     Promptly following the execution of this Agreement, Buyer shall deposit with a third party escrow agent or title company $1,000,000 by wire transfer of immediately available funds (the "**Deposit Amount**"), to be governed by mutually agreed instructions providing as follows:

(i)     If the Closing occurs, the Deposit Amount shall be applied in partial satisfaction of the Purchase Price;

(ii)     If this Agreement is validly terminated by the Receiver due to Buyer's breach, the Deposit Amount shall be delivered to the Receiver on behalf of the Company as liquidated damages (the parties agreeing that actual damages would be difficult to calculate, while such amount is a reasonable approximation of the Receiver's and the Company's damages) as the Receiver's and the Company's sole and exclusive remedy against Buyer;

(iii)     If this Agreement is validly terminated for any reason other than a breach by Buyer, the Deposit Amount shall be returned to Buyer; and

(iv)     If the Closing does not occur within four months after the Effective Date, the Deposit Amount shall be transferred to an interest-bearing account.

(c)     As an adjusting increase to the Purchase Price, at the Closing Buyer shall reimburse the Company for the standby transmission charges paid by the Company from the Effective Date through the Closing pursuant to the last sentence of Section 4.2(a).

**2.3     Procedures for Assumption and Assignment of Agreements**

Nothing herein shall be deemed to require the transfer, assignment, conveyance or delivery of any Purchased Asset that by operation of applicable law or by failure to obtain a required consent cannot be transferred, assigned, conveyed or delivered. Notwithstanding anything in this Agreement to the contrary, to the extent that the sale, transfer, assignment, conveyance or delivery or attempted sale, transfer, assignment, conveyance or delivery to Buyer of any asset, property or right that would be a Purchased Asset or any claim or right or any benefit arising thereunder or resulting therefrom is prohibited by any applicable law or would require any consent from any Governmental Body or any other third party and such consents shall not have been obtained prior to the Closing Date, the Closing shall proceed without the sale, transfer, assignment, conveyance or delivery of such asset, property or right unless there is a failure of one or more of the conditions set forth in Article VII, in which event the Closing shall proceed only if each such failed condition is waived by the Party entitled to the benefit thereof.

**2.4    Apportionments**

The following apportionments shall be made between the Receiver and Buyer as of the Closing Date (the "**Closing Apportionments**") based on the latest available information, and the amounts derived therefrom shall be (as applicable) added to or deducted from the Purchase Price in accordance with Section 2.2:

(a)    The Receiver has prepared a calculation of the Company's Current Assets and Current Liabilities as of July 31, 2010 which is set forth on the attached Schedule 2.4(a). Within two (2) days prior to Closing, the Receiver and Buyer shall determine the Company's Current Assets and Current Liabilities as of the Closing Date, which shall be calculated on a basis consistent with Schedule 2.4(a) and with the Employees set forth on Schedule 2.1(c)(iv) or other Employees engaged after July 31 in the ordinary course of business consistent with this Agreement. If the Current Assets as of the Closing Date exceed the Current Liabilities, the amount of such excess shall be treated as an increase to the Purchase Price on a dollar for dollar basis. If the Current Assets as of the Closing Date are less than the Current Liabilities as of the Closing Date, then the amount of the deficiency shall be treated as a reduction to the Purchase Price on a dollar for dollar basis.

(b)    Buyer and the Receiver agree to arrange, before the Closing Date, for Buyer to be billed for all utilities and other Accounts Payable from and after the Closing Date.

(c)    On the day immediately prior to the Closing Date, Buyer and the Receiver shall physically inspect the level of the Company's fuel supply to determine the Company's fuel stockpile as of the Closing Date (the "**Closing Fuel Stockpile**"). An adjustment to the Purchase Price shall be made as follows: if the Closing Fuel Stockpile is below 10,000 bone-dry tons (the "**Target Fuel Stockpile**"), the Purchase Price shall be reduced by $40 for each bone-dry ton the Closing Fuel Stockpile is below the Target Fuel Stockpile, and if the Closing Fuel Stockpile is above the Target Fuel Stockpile, the Purchase Price shall be increased by $40 for each bone-dry ton the Closing Fuel Stockpile is above the Target Fuel Stockpile.

**ARTICLE III**
**CLOSING**

**3.1    Closing**

Subject to the satisfaction of the conditions set forth in Sections 7.1 and 7.2 (or the waiver thereof by the Party entitled to waive that condition), the closing of the Sale (the "**Closing**") shall take place at the offices of Latham & Watkins LLP, 505 Montgomery Street, Suite 2000, San Francisco, California, or such other location as the Parties shall mutually agree, at 10:00 a.m. (San Francisco, California time) on the earlier of (a) the Outside Date or (b) the date which is two Business Days after Buyer delivers to the Receiver written notice of its desire to close, but subject to the satisfaction or waiver of the conditions set forth in Sections 7.1 and 7.2, unless another time or date, or both, are agreed to in writing by the Parties. The date upon which the Closing occurs is hereinafter referred to as the "**Closing Date**." Unless otherwise agreed by the Parties in writing, the Closing shall be deemed effective and, except as otherwise provided in this Agreement, all right, title and interest of the Company in the Purchased Assets

and Assumed Liabilities to be acquired and assumed by Buyer hereunder shall be considered to have passed to Buyer as of 12:01 a.m. (San Francisco, California time) on the Closing Date.

## 3.2 Termination

This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing (the effective date of such termination, the "**Termination Date**"):

(a)  by mutual written consent of Buyer and the Receiver;

(b)  immediately upon receipt of Notice from Buyer or the Receiver, if any of the conditions in Section 7.2 (if Buyer is the terminating Party) or Section 7.1 (if the Receiver is the terminating Party) have not been satisfied by the Outside Date, or if satisfaction of any such conditions is or becomes impossible, in each case other than through the failure of the terminating Party to comply with such Party's obligations under this Agreement by such date; provided, however, in the event the conditions set forth in Sections 7.2(e) and 7.2(f) shall not have been satisfied on or prior to the Outside Date and the Receiver is diligently attempting to satisfy such conditions, the Receiver may unilaterally extend the Outside Date, by delivering notice to Buyer on or before the original Outside Date, for an additional 60 days, in which case the Outside Date shall be deemed for all purposes to be such date;

(c)  by Buyer or the Receiver, if there shall be a breach by the other of any representation or warranty or any covenant or agreement contained in this Agreement that would result in a failure of a condition set forth in Section 7.2 (if Buyer is the terminating Party) or Section 7.1 (if the Receiver is the terminating Party), and which breach cannot be cured or has not been cured by 10 Business Days after the giving of written Notice by the terminating Party to the non-terminating Party of such breach; or

(d)  by Buyer or the Receiver, if (i) Buyer is not approved as the purchaser of the Purchased Assets or (ii) any Person (other than Buyer) is selected and approved by the Bankruptcy Court at the Sale Hearing as the purchaser of the Purchased Assets or any part thereof.

Upon any termination, the Party effecting such termination shall deliver Notice thereof to the other Party as promptly as practicable.

## 3.3 Effect of Termination

No termination of this Agreement pursuant to Section 3.2 shall be effective until Notice thereof is given to the non-terminating Party specifying the provision hereof pursuant to which such termination is made. In the event that this Agreement is validly terminated as provided herein, then each of the Parties shall be relieved of their respective duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Buyer, the Receiver or the Company (or any of their affiliates or representatives); provided, however, that the obligations of the Parties set forth in Sections 4.4 and 8.1(d) shall survive any such termination and shall be enforceable hereunder and the Deposit Amount shall be paid as provided in Section 2.2.

# ARTICLE IV
## ACTIONS PRIOR TO THE CLOSING DATE

### 4.1    Investigation by Buyer

Until the Closing, the Receiver shall furnish or make available to Buyer such information concerning and access to the Purchased Assets and the Employees as shall be reasonably requested, including information as shall be reasonably necessary to enable Buyer to verify the accuracy of the representations and warranties contained in this Agreement and to verify that the covenants of the Receiver contained in this Agreement have been complied with. So long as there is no disruption to the Business and Buyer's conduct is in accordance with the reasonable requirements of the Receiver, and the Receiver and its advisers participate therein if the Receiver so wishes, Buyer and its agents shall be entitled to contact and engage in discussions with the Business' vendors and customers, and the Receiver shall cooperate with Buyer to facilitate such contact and discussions. Notwithstanding anything herein to the contrary, the Receiver shall not be required to disclose (i) due diligence questions, lists or investigations conducted by others, names, bids, letters of intent, expressions of interest, or other proposals received from others in connection with the transactions contemplated hereby or other information and analyses relating to such communications or (ii) information (A) subject to attorney-client privilege, (B) which would conflict with any confidentiality obligations to which the Company or the Receiver is bound or (C) in violation of applicable law. Buyer and its agents agree to abide by the confidentiality terms of the Confidentiality Agreement and any safety rules or rules of conduct reasonably imposed by the Company or the Receiver with respect to such access and any information furnished to it or its representatives pursuant thereto.

### 4.2    Conduct of Business

(a)    Prior to the Closing, the Receiver shall conduct the Business in the Ordinary Course of Business, taking into account, where applicable, the funding limitations imposed on the Receiver, and the reasonably anticipated effects thereof. Without limiting the generality of the foregoing, the Receiver shall timely pay the transmission charge for reserved capacity set forth in Section 8.1 of the Service Agreement, dated as of July 10, 2006, between Arizona Public Service Company and the Company. Buyer acknowledges that the Receiver not ordering the equipment set forth on <u>Schedule 4.2(c)</u> because Buyer does not request the Receiver to do so as provided in Section 4.2(c) shall not be considered outside the Ordinary Course of Business.

(b)    Between the Effective Date and the earlier of the Closing Date or the date of termination of this Agreement pursuant to Section 3.2, subject to funding limitations imposed on the Receiver and the reasonably anticipated effects thereof:

(i)    the Receiver shall not, in respect of the Purchased Assets or the operation of the Business:  (A) sell, transfer, lease (as lessor), encumber or otherwise dispose of any Purchased Assets or any interest therein, other than immaterial dispositions in the Ordinary Course of Business; terminate or modify the material terms of any of the Purchased Contracts, other than modifications to such contracts that will not adversely affect the benefits anticipated to occur to the benefit of the Company or Buyer thereunder; or (B) make any change in the base compensation payable (exclusive of

13

bonuses and benefits) or to become payable to any Employee; provided, however, that, notwithstanding the preceding, the Receiver may take any of such actions with the prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned or delayed; and

       (ii)     the Receiver shall (i) use commercially reasonable efforts to preserve intact the goodwill of the Business and the relationships of the Company with its customers, vendors, suppliers, creditors, agents, equipment lessors, service providers, Employees and others having business relations with them and the Business, including performing its obligations under the Purchased Contracts, (ii) fund and operate the Business in the Ordinary Course of Business, (iii) pay all Taxes imposed on the Business or Purchased Assets before such Taxes become delinquent or in default, (iv) continue to pay for all required services in order to conduct the Business, including rents, utility bills, and phone bills in the Ordinary Course of Business, (v) continue to maintain the books and records related to the Business and the Purchased Assets on a basis consistent with the Company's past practice, and in any event in a commercially reasonable and prudent manner; (vi) maintain the Purchased Assets in their current working order and condition, ordinary wear and tear excepted and (vii) maintain compliance, in all material respects, with all laws that relate to the Business and the Purchased Assets, in the case of each of the foregoing clauses (i) – (vii), to the extent assets sufficient to do so are made available to the Receiver, and (viii) not, without the approval of the Buyer, voluntarily terminate or reject any Purchased Contract.

       (c)     Attached as Schedule 4.2(c) is a list of equipment.  If Buyer directs the Receiver in writing to acquire any or all of such equipment prior to the Closing Date, Buyer shall either reimburse the Receiver at the Closing for the cost of the equipment actually paid for by the Receiver, as in an increase to the Purchase Price, or shall assume the obligation to pay for the cost of the equipment if payment therefor has not been made prior to the Closing Date.  Any obligations to pay for the equipment assumed by Buyer shall not be Current Liabilities and shall not be considered in connection with the Closing Apportionment described in Section 2.4(a).

## 4.3    Additional Obligations

       Prior to the Closing, the Receiver and Buyer shall take all other commercially reasonable steps necessary or desirable to consummate the transactions contemplated hereby.

## 4.4    Confidentiality

       Except for disclosures expressly permitted by the terms of the Confidentiality Agreement, each Party shall hold, and shall cause its respective officers, employees, accountants, counsel, financial advisors and other representatives to hold, all information received from any other party in furtherance of the transactions contemplated hereby as confidential and such information shall be subject to the Confidentiality Agreement.

## 4.5    Employment Arrangements

       (a)     Future Employment.  On the Closing Date, Buyer may offer employment to some or all of the Employees.  All such offers of employment shall be subject to such compensation

and other terms of employment as Buyer shall determine in its sole discretion. On the Closing Date, the Receiver shall terminate the employment of each Transferred Employee and Buyer shall commence its employment of such Transferred Employee. If Buyer does not wish to offer employment to any Employee or if Buyer offers such employment but any Employee declines to be employed by Buyer, the Receiver may elect to retain or terminate such Employee, but the Company (and not Buyer) shall be solely liable for all costs of any retention or termination of such Employee's employment.

(b)     No Right to Employment. Notwithstanding Section 4.5(a), nothing herein expressed or implied shall confer upon any Employee or any Transferred Employee any right to employment or continued employment for any specified period, of any nature or kind whatsoever under or by reason of this Agreement.

(c)     No Obligation. Neither Buyer nor any of its affiliates shall have any Liability whatsoever for any compensation or other obligations purported to be owing to any Transferred Employee by the Company, including any severance, separation pay, change of control payments or benefits, retention payments or any other payments or benefits arising in connection with the termination of such employee's employment with the Company before, on or after the Closing Date.

(d)     Post-Closing Cooperation. Following the Closing, the Parties shall cooperate reasonably with each other to provide an orderly administrative transition to Buyer of the Transferred Employees, including the provision by the Receiver to Buyer of all necessary or appropriate documents, records, materials, accounting files and tax information with respect to each Transferred Employee (provided that the Company shall remain responsible for W-2 reporting for the Employees with respect to periods they were employed by the Company).

## 4.6     Insurance

Between the Effective Date and the earlier of the Closing Date or the Termination Date, the Receiver shall use its commercially reasonable efforts to keep in effect all policies of insurance currently maintained by the Company to insure the Business and the Purchased Assets (collectively, the "**Company Insurance Policies**"). To the extent that the Company Insurance Policies insure against any loss, Liability, claim, damage or expense resulting from, arising out of, based on or relating to occurrences arising on or after the Effective Date and prior to the Closing with respect to the Business or the Purchased Assets and permit claims to be made thereunder with respect to such losses, Liabilities, claims, damages or expenses after the Closing, Receiver shall use its commercially reasonable efforts to obtain an insurance certificate naming Buyer as an additional insured under the Company Insurance Policies.

## 4.7     Qualification in Arizona

On or before the Closing, Buyer shall become qualified to do business in Arizona as a foreign limited liability company.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF RECEIVER

The Receiver represents and warrants to Buyer that, except as set forth in the disclosure schedules delivered by the Receiver to Buyer concurrently herewith, to the Receiver's Knowledge the statements contained in this Article V are true and correct as of the date of this Agreement, except to the extent such representations and warranties are specifically made as of a particular date (in which case such representations and warranties will be true and correct as of such date):

### 5.1    Authority, Approval and Enforceability

Except for such authorization as is required by the Bankruptcy Court and the Receivership Court, this Agreement has been, and each of the Sale Documents will be at or prior to the Closing, duly and validly executed and delivered by the Receiver and (assuming the due authorization, execution and delivery by Buyer and the entry of the Sale Order) this Agreement constitutes, and each of the Sale Documents when so executed and delivered will constitute, a valid and binding obligation of the Receiver, enforceable against it in accordance with its terms.

### 5.2    Title to Purchased Assets

The Receiver has Bankruptcy Court-authorized possession, custody and control over the Purchased Assets and, subject to further order of the Bankruptcy Court, the right to sell the Purchased Assets. By virtue of the transactions contemplated by this Agreement, at the Closing Buyer will obtain good and marketable title to the Purchased Assets, free and clear of any Liens except Permitted Liens. Schedule 5.2 includes all of the Plant equipment.

### 5.3    No Consents

Except as set forth on Schedule 5.3 and except for such authorization as is required by the Bankruptcy Court, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will require the Receiver or the Company to obtain or make any material waiver, consent, action, approval or authorization of, or registration, declaration, notice or filing with, any Governmental Body or other Person, except as would not have a Material Adverse Effect.

### 5.4    Legal Compliance

The Company is currently in compliance with each law (including rules and regulations thereunder) of any Governmental Body applicable to the Purchased Assets, except where the failure to be in compliance would not have a Material Adverse Effect or materially impair the Company's ownership or use of the Purchased Assets.

(a)    Without limiting the generality of the foregoing, the Company is in material compliance with all Environmental Laws (as defined below); (ii) the Company has obtained all applicable Environmental Permits (as defined below); (iii) all such permits are in full force and effect; and (iv) the Company is in material compliance with all such Environmental Permits. As used herein, "**Environmental Laws**" shall mean all applicable federal, state, local

16

and foreign laws, ordinances, rules, regulations, judgments, orders, or decrees relating to the protection or regulation of human health, safety, or the environment enacted as of the date of this Agreement, including to the extent applicable, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. §§ 9601 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901 et seq.), the Clean Water Act (33 U.S.C. §§ 1251 et seq.), the Atomic Energy Act (42 U.S.C. § 2201 et seq.), and similar state and local laws. "**Environmental Permits**" shall mean all applicable licenses and permits or other approvals required under applicable Environmental Laws in connection with the ownership or operation of the Business.

(b)     There is no pending or written threatened claim, litigation, or administrative proceeding, or known prior claim, litigation or administrative proceeding arising under any Environmental Law involving the Purchased Assets, the Business or the Real Property. The Company is in material compliance with all zoning, entitlement or other land use regulations of any Governmental Body in connection with the Purchased Assets, the Business and the Real Property.

(c)     During the period that the Company has conducted the Business on the Real Property, except in material compliance with all Environmental Laws, the Company has not stored, handled, recycled, reclaimed, disposed of, or contracted for the disposal of, hazardous materials in connection with the Business. During the period that the Company has conducted the Business on the Real Property, there have been no releases of any hazardous materials into the environment or onto, under or about the Real Property in connection with the Business, except in compliance with all Environmental Laws.

(d)     The Company has not transported hazardous materials except in compliance with all Environmental Laws.

(e)     The Company has provided or made available to Buyer true and complete copies of all environmental audits, studies, reports, analyses and monitorings, and all material correspondence on substantial environmental matters, in its possession or control, relating to the Purchased Assets, the Business or the Real Property.

## 5.5     Financial Statements

(a)     The Receiver has previously furnished to Buyer an unaudited balance sheet as of March 31, 2010 and an unaudited income statement for the quarter ended March 31, 2010 with respect to the Business (the "**Financial Statements**").

(b)     The Financial Statements present fairly, in all material respects, the financial position of the Business as of the dates indicated and the results of operations for the periods then ended, all in conformity with GAAP.

## 5.6     No Proceedings

Except for all claims or pending motions that have been asserted or filed prior to the Effective Date by third parties against the Company in the Receivership Case or the Bankruptcy Case, no suit, action or other proceeding is pending or, threatened before any Governmental

Body seeking to restrain the Receiver or the Company or prohibit their entry into this Agreement or prohibit the Closing, or seeking damages against the Receiver or the Company or the Purchased Assets as a result of the consummation of this Agreement.

## 5.7    Permits

Schedule 5.7 sets forth a list of all of the material Permits that are used in the conduct of the Business as currently conducted which are held by either the Company or Catalyst.  Except as set forth on Schedule 5.7, the Company is in compliance, in all material respects, with the terms of such Permits issued to it.

## 5.8    Litigation

Except for the Receivership Case and the Bankruptcy Case and other matters on the docket related thereto, (a) there are no material claims (including with respect to products liability claims) pending or threatened against the Company with respect to the Business or any of the Purchased Assets at law or in equity, or before or by any federal, state, municipal, or other governmental department, commission, board, bureau, agency, or instrumentality, domestic or foreign involving an amount in excess of $50,000 or seeking injunctive relief and (b) there are no claims pending or threatened that question the validity of any of the Sale Documents or any of the transactions contemplated hereby or thereby.

## 5.9    Absence of Changes

Except as expressly contemplated by this Agreement, since the Effective Date, the Company has not:

(a)    suffered any theft, damage, destruction or casualty loss in excess of $50,000 to any property or asset of a type that would be included in the Purchased Assets, whether or not covered by insurance, or suffered any material damage to or destruction of its books and records; or

(b)    taken any action that would be prohibited under Section 4.2(b) were it taken after the Effective Date and prior to Closing, and neither the Receiver nor the Company has committed to take any such action.

## 5.10   Locations of Business

The power generation facility located in Snowflake, Arizona and the office located at 3418 N. Val Vista Drive, Mesa, Arizona represent the only locations where the Company conducts the Business.

## 5.11   Employees

(a)    Except as disclosed in writing to Buyer prior to the execution of this Agreement, the Company has not received notification that any of the Employees presently plan to terminate their employment, whether by reason of the transactions contemplated hereby or otherwise.

18

(b)     Except as disclosed in writing to Buyer prior to the execution of this Agreement, there are no claims or complaints pending or threatened against the Company before any court or governmental agency and involving any alleged unlawful employment practices with respect to the Employees, whether or not relating to the laws described above.  There are no material controversies pending or threatened between the Company and any of the Employees.

## 5.12     Key Financial Information; Recent Reports

The records of the Business to which the Receiver has provided, and will provide, access to Buyer are sufficient to identify the Employees and their compensation arrangements and the suppliers and customers of the Business.  Buyer has been provided true and correct copies of all material written operating reports by the plant manager and the Receiver for the month prior to the Effective Date.

## 5.13     Real Property

(a)     The Company does not own the fee interest to any real property.

(b)     Schedule 5.13 lists all real property leased or subleased to the Company.  The Receiver has delivered to Buyer correct and complete copies of the leases and subleases listed in Schedule 5.13. Each lease and sublease listed in Schedule 5.13 is legal, valid, binding and enforceable against the Company and the other party thereto in accordance with its terms, and in full force and effect, except where the illegality, invalidity, nonbinding nature, unenforceability, or ineffectiveness would not have a Material Adverse Effect.  Except as set forth on Schedule 5.13, with respect to each such lease and sublease, the Company has not received written notice of the intention of any party to such contract to cancel, terminate or renegotiate any such contract or notice of any default that is outstanding as of the Effective Date.

## 5.14     Contracts

Schedule 5.14, together with the employment arrangements of the Employees as set forth on Schedule 2.1(c)(iv), lists all contracts and other agreements (other than any lease or sublease required to be disclosed on Schedule 5.13), whether written or oral, to which the Company is a party the performance of which will involve consideration in excess of $50,000 or which are otherwise material to the Business.  The Receiver has delivered to Buyer a correct and complete copy of each contract or other agreement listed in Schedule 5.14.  All such contracts are valid, binding and enforceable against the Company and the other parties thereto in accordance with their respective terms, and in full force and effect, except where the illegality, invalidity, nonbinding nature, unenforceability, or ineffectiveness would not have a Material Adverse Effect.  Except as set forth on Schedule 5.14, with respect to each such contract, the Company has not received written notice of the intention of any party to such contract to cancel, terminate or renegotiate any such contract or notice of any default that is outstanding as of the Effective Date.

SF\762717.4

**5.15    Insurance**

Schedule 5.15 contains a true and complete list of all insurance policies in force with respect to the Business.  True and complete copies of such insurance policies have been made available to Buyer.

**5.16    Taxes**

All Taxes imposed on the Purchased Assets required to have been paid by the Company have been paid.  There are no Liens for Taxes (other than for Taxes not yet due and payable or being contested in good faith by appropriate proceedings) upon any of the Purchased Assets.

**5.17    No Other Representations or Warranties**

Except for the representations and warranties contained in this Article V, neither the Receiver nor any other Person makes any other express or implied representation or warranty with respect to the Company, the Purchased Assets or the transactions contemplated hereby, and the Receiver disclaims any other representations or warranties, whether made by the Receiver, its affiliates or any of its respective representatives.  Except for the representations and warranties contained in this Article V, the Purchased Assets are sold on an "as is, where is" basis as of the Closing, and the Receiver (a) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or any of its affiliates or representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any director, officer, employee, agent, consultant, or representative of the Receiver, the Company or any of their affiliates).

**ARTICLE VI**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer represents and warrants to the Receiver that:

**6.1    Existence and Qualification**

Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware.

**6.2    Authority, Approval and Enforceability**

Buyer has full limited liability company power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated hereby or to be executed by Buyer in connection with the consummation of the transactions contemplated hereby and thereby (the **"Buyer Documents"**), to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Buyer of this Agreement and each Buyer Document

have been duly authorized by all necessary limited liability company action on behalf of Buyer. This Agreement has been, and each of Buyer Documents will be at or prior to the Closing, duly and validly executed and delivered by Buyer and (assuming the due authorization, execution and delivery by the Receiver) this Agreement constitutes, and each Buyer Document when so executed and delivered will constitute, a valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

**6.3     No Default or Consents**

Except as expressly provided in this Agreement, subject to entry of the Sale Order, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will:

(a)     violate or conflict with any of the terms, conditions or provisions of Buyer's certificate of formation or operating agreement;

(b)     violate any legal requirements applicable to Buyer, except for such violations that would not have a material adverse effect on Buyer's ability to perform its obligations hereunder;

(c)     violate, conflict with, result in a breach of, constitute a default under (whether with or without notice or the lapse of time or both), or accelerate or permit the acceleration of the performance required by, or give any other party the right to terminate, any contract or Permit applicable to Buyer, except as would not have a material adverse effect on Buyer's ability to perform its obligations hereunder; or

(d)     require Buyer to obtain or make any material waiver, consent, action, approval or authorization of, or registration, declaration, notice or filing with, any Governmental Body or other Person, other than approval from the Federal Energy Regulatory Commission pursuant to Section 203 of the Federal Power Act (which Buyer hereby agrees to request promptly following the Effective Date).

**6.4     No Proceedings**

No suit, action or other proceeding is pending or, to Buyer's knowledge, threatened before any Governmental Body seeking to restrain Buyer or prohibit its entry into this Agreement or prohibit the Closing, or seeking damages against Buyer or its assets as a result of the consummation of this Agreement.

**6.5     Financial Advisors**

No person has acted, directly or indirectly, as a broker, finder or financial advisor for Buyer or any of its affiliates in connection with the transactions contemplated hereby and no person is entitled to any fee or commission or like payment in respect thereof.

**6.6     Financial Capability**

Buyer (a) has, and will maintain from the Effective Date through and including the Closing, sufficient funds to pay the Purchase Price and any expenses incurred by Buyer in

connection with the transactions contemplated hereby in full in immediately-available funds, (b) has, and at the Closing will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder, and (c) has not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities.

## 6.7    No Other Representations

Except for the representations and warranties contained in this Article VI, Buyer makes no other express or implied representation or warranty with respect to Buyer or the transactions contemplated hereby.

## 6.8    Condition of Business

Buyer acknowledges that it has conducted to its satisfaction, its own independent investigation of the Business and, in making the determination to proceed with the transactions contemplated hereby, Buyer has relied on the results of its own independent investigation.

## ARTICLE VII
## CONDITIONS TO PARTIES' OBLIGATIONS

## 7.1    Conditions to Obligations of the Receiver

The obligations of the Receiver to consummate the transactions contemplated hereby are subject, at the option of the Receiver, to the satisfaction, or waiver by the Receiver, of the following conditions:

(a)    the representations and warranties of Buyer contained in this Agreement shall, if qualified by reference to materiality or material adverse effect, be true and correct in all respects, and if not so qualified, shall be true and correct in all material respects, in each case on the date of this Agreement (except to the extent cured prior to the Closing Date) and on the Closing Date as though made on the Closing Date, except to the extent such representations and warranties speak as of an earlier date, in which case such representations and warranties qualified by reference to materiality or material adverse effect shall be true and correct in all respects and those not so qualified shall be true and correct in all material respects on and as of such earlier date;

(b)    there shall not have been any event, circumstance, change or effect that has a material adverse effect on Buyer's ability to perform under this Agreement;

(c)    Buyer shall have performed and complied in all material respects with its obligations and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing Date;

(d)    Buyer shall have obtained from Future Forest and returned to CoBank the $300,000 letter of credit securing the Company's obligations under the Future Forest Contract;

22

(e)     the Bankruptcy Court shall have entered the Sale Order on or before the Outside Date, and such Sale Order shall not be subject to any stay;

(f)     Buyer shall have delivered to the Receiver:

(i)     the Purchase Price, by wire transfer of immediately available funds, as provided in Section 2.2;

(ii)     the Assignment and Assumption Agreement duly executed by Buyer; and

(iii)     an officer's certificate, dated the Closing Date and certifying that the conditions in Sections 7.1(a), (b) and (c) have been satisfied (such certificate, the **"Buyer's Officer's Certificate"**); and

(g)     Buyer shall be the Successful Bidder as defined in the Sale Procedures.

## 7.2     Conditions to Obligations of Buyer

The obligations of Buyer to consummate the transactions contemplated hereby are subject, at the option of Buyer, to the satisfaction, or waiver by Buyer, of the following conditions:

(a)     the representations and warranties of the Receiver contained in this Agreement shall, if qualified by reference to materiality or Material Adverse Effect, be true and correct in all respects, and if not so qualified, shall be true and correct in all material respects, in each case on the date of this Agreement (except to the extent cured prior to the Closing Date) and on the Closing Date as though made on the Closing Date, except to the extent such representations and warranties speak as of an earlier date, in which case such representations and warranties qualified by reference to materiality or Material Adverse Effect shall be true and correct in all respects and those not so qualified shall be true and correct in all material respects on and as of such earlier date; provided that for purposes of this condition, any representation and warranty of the Receiver which the Receiver believes is true and correct but which is not in fact true and correct shall be deemed true and correct if any responsible officer of Buyer has actual knowledge of the inaccuracy on the Effective Date;

(b)     since the date of this Agreement there shall have been no Material Adverse Effect;

(c)     the Receiver shall have performed and complied in all material respects with its obligations and covenants required by this Agreement to be performed or complied with by it on or prior to the Closing Date;

(d)     the Purchased Permits identified on Schedule 5.7 shall have been transferred to Buyer effective upon the Closing Date or shall be transferrable as a ministerial matter;

(e)     all consents from third party required for the assignment of the Purchased Contracts identified on Schedule 5.3 shall have been obtained;

23

(f)     the Company shall have assumed the Purchased Contracts (including, without limitation, the power purchase agreement with APS) and obtained Bankruptcy Court approval to assign the Purchased Contracts to Buyer in connection with the Sale, and Catalyst shall have acknowledged to Buyer that the Company is not, to the knowledge of Catalyst, in a material default under the Catalyst Lease;

(g)     CoBank shall have (i) released all of its Liens against the Purchased Assets, (ii) consented to the fee in Section 8.1(d); and (iii) waived its right to credit bid at the Sale;

(h)     the Bankruptcy Court shall have entered the Sale Order on or before the Outside Date and such Sale Order shall not be subject to any stay;

(i)     the Federal Energy Regulation Commission shall have approved the Sale to Buyer under Section 203 of the Federal Power Act; and

(j)     the Receiver shall have delivered to Buyer:

(i)     the Bill of Sale duly executed by the Receiver;

(ii)     the Assignment and Assumption Agreement duly executed by the Receiver;

(iii)     a certificate, dated the Closing Date and certifying that the conditions in Sections 7.2(a), (b) and (c) have been satisfied (such certificate, the "**Receiver's Certificate**"); and

(iv)     all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Buyer, as may be necessary to convey the Purchased Assets to Buyer.

## ARTICLE VIII BANKRUPTCY COURT MATTERS

**8.1     Sale Motion; Sale Order**

(a)     In connection with the Company's Bankruptcy proceeding and the proposed (i) sale of the Purchased Assets pursuant to Sections 363(b) and (f) of the Bankruptcy Code, and (ii) assumption and assignment of the Purchased Contracts by Buyer pursuant to Section 365 of the Bankruptcy Code, the Company shall file with the Bankruptcy Court on or after the Effective Date: (A) a sale procedures motion (the "**Procedures Motion**") requesting approval of the sale procedures attached hereto as Exhibit C (the "**Sale Procedures**"), and (B) a sale motion (the "**Sale Motion**") and requested form of sale order (the "**Requested Form of Sale Order**"), which Requested Form of Sale Order is attached hereto as Exhibit D. The Procedures Motion and the Sale Motion shall be approved by Buyer in advance of filing. Further, any modification of the Sale Procedures or the Requested Form of Sale Order that is materially adverse to Buyer must be approved by Buyer. In the event that the Buyer does not approve any materially adverse modifications to the Sale Procedures or Requested Form of Sale Order, then either Party shall have the right to terminate this Agreement upon written notice to the other Party, in which case

SF\762717.4

the Deposit Amount shall be immediately returned to Buyer and Buyer shall be entitled to compensation if the circumstances described in Section 8.1(d) apply.

(b)     The Parties agree as follows:

(i)     Without limitation, the following shall be deemed to be materially adverse modifications to the Sale Procedures giving rise to the termination rights described in Section 8.1(a): (A) any adverse change to the Proposed Purchaser Expenses (as defined in the Sale Procedures and as set forth in Section 8.1(d)), (B) any reduction of the Good Faith Deposit (as defined in the Sale Procedures), or (C) any reduction of the bid increments that would adversely affect the ability of the Company to pay Buyer the Proposed Purchaser Expenses.

(ii)     Without limitation, the following shall be deemed to be materially adverse modifications to the Requested Form of Sale Order giving rise to the termination rights described in Section 8.1(a): (A) the Purchased Assets will not be transferred free and clear of all Interests and Claims (as defined in the Requested Form of Sale Order), including those set forth in Section F of the Requested Form of Sale Order, (B) the Interests and Claims of third parties relating to the Purchased Assets or the transfer thereof to Buyer are not forever barred, estopped and permanently enjoined, (C) Buyer shall not be vested with title to the Purchased Assets, free and clear of all Interests and Claims, other than the Assumed Liabilities, (D) the Purchased Contracts will not be assigned free and clear of all Interests and Claims, (E) the parties to the Purchased Contracts will not be barred, estopped and permanently enjoined from asserting claims against Buyer for pre-closing obligations that are not Assumed Liabilities, or (F) Buyer is not deemed to have undertaken this transaction in good faith, and is not deemed to be a good faith purchaser under Section 363(m) of the Bankruptcy Code.

(iii)     The Procedures Motion and the Sale Motion shall state that neither the Receiver nor Buyer shall be under any obligation to consummate the sale, if any party files a notice of appeal of the Sale Order, and a stay pending appeal is issued by the Bankruptcy Court or any other court of competent jurisdiction.

(iv)     Notwithstanding anything to the contrary contained herein, in the event of a conflict or inconsistency between the terms and conditions of the Sale Procedures and/or the Requested Form of Sale Order and the provisions of this Agreement, the terms and conditions of this Agreement shall control.

(c)     If the Purchased Assets and Purchased Contracts are transferred pursuant to a sale under Section 363 of the Bankruptcy Code, on the Closing Date the Company shall (i) be required to pay all amounts determined by the Bankruptcy Court to be necessary to cure monetary defaults under the Purchased Contracts to the extent assigned to Buyer in connection with the sale, (ii) if any such cure amount has not been finally determined by the Bankruptcy Court, or otherwise agreed upon by the applicable parties, then the Company shall escrow all amounts necessary to pay anticipated claims, and (iii) have otherwise complied with Section 365(b) of the Bankruptcy Code.

(d)     In the event that (i) (A) Buyer is not the successful bidder in the sale of the Business conducted pursuant to Bankruptcy Rule 363 or (B) the Bankruptcy Court requires a modification of the Sale Procedures or the Requested Form of Sale Order that is materially adverse to Buyer and as to which Buyer does not consent, and (ii) the Business is sold to another Person who is a Qualified Bidder at the Auction (as those terms are defined in the Sale Procedures), then in addition to the return of the Deposit Amount, upon consummation of such alternative sale the Company shall pay to Buyer an amount equal to Two Hundred Fifty Thousand Dollars ($250,000.00) to reimburse Buyer for its costs and expenses in connection with this transaction. In addition, the Company shall pay Buyer the Two Hundred Fifty Thousand Dollar payment described in the previous sentence in the event that Buyer terminates this Agreement under Section 3.2(c) due to a breach by the Receiver; provided that the payment shall be made contemporaneously with the sale of the Business to the buyer designated at the Auction, and if there is no sale of the Business to the buyer designated at the Auction, contemporaneously with and from the first proceeds received from any sale of the Business or the Company's assets that occurs within two (2) years following the date of termination of this Agreement.

## ARTICLE IX
## TAXES

### 9.1     Transfer Taxes

Any sales, use, purchase, transfer, deed, stamp, documentary stamp, use or other similar Taxes and recording charges due and which may be payable by reason of the sale of the Purchased Assets or the transactions contemplated herein ("**Transfer Taxes**") shall be borne and timely paid solely by Buyer. The Receiver and Buyer shall cooperate and consult with each other prior to filing any Tax Returns in respect of Transfer Taxes, including any available pre-sale filing procedure.

### 9.2     Purchase Price Allocation

Within 90 days after the Closing Date, the Receiver and Buyer shall allocate the Purchase Price among the Purchased Assets and, in accordance with such allocation, Buyer shall prepare and deliver to the Receiver copies of Form 8594 and any required exhibits thereto (the "**Asset Acquisition Statement**"). Buyer shall prepare and deliver to the Receiver from time to time revised copies of the Asset Acquisition Statement (the "**Revised Statements**") so as to report any matters on the Asset Acquisition Statement that need updating (including purchase price adjustments, if any) consistent with the agreed upon allocation, which Revised Statements shall be subject to the Receiver's reasonable approval. The Purchase Price for the Purchased Assets shall be allocated in accordance with the Asset Acquisition Statement or, if applicable, the last Revised Statements, provided by Buyer to the Receiver, and all income Tax Returns filed by Buyer and the Company shall be prepared consistently with such allocation. Each Party to this Agreement shall notify the other Party in the event that any Governmental Body challenges such allocation.

# ARTICLE X MISCELLANEOUS

## 10.1 Nonsurvival of Representations, Warranties and Covenants

All representations, warranties, covenants and agreements of the Parties made herein or in any other agreement delivered pursuant to this Agreement shall not survive beyond the Closing and there shall be no Liability in respect thereof, whether such Liability has accrued prior to or after the Closing, on the part of any Party or any of its officers, directors, employees, agents or affiliates; provided, however, that the representations and warranties of the Parties set forth in Sections 5.1, 5.2, 5.3, 6.1 and 6.2 shall survive Closing until the expiration of the applicable statute of limitations, and that all covenants and agreements which, by their terms contemplate performance after the Closing, shall survive in accordance with their terms.

## 10.2 Injunctive Relief

Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements of the Receiver contained in this Agreement, and, accordingly Buyer shall be entitled to injunctive relief with respect to any such breach, including specific performance of such covenants, promises or agreements or an order enjoining the Receiver from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement. The rights set forth in this Section 10.2 shall be in addition to any other rights which Buyer may have at law or in equity pursuant to this Agreement.

## 10.3 Further Assurances

Following the Closing, each of the Parties shall execute and deliver such documents, and take such other action, as shall be reasonably requested by any other Party hereto in order to consummate the transactions contemplated hereby.

## 10.4 Expenses

Except as otherwise provided in this Agreement, each Party shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

## 10.5 Notices

Any notice, request, instruction, correspondence or other document to be given hereunder by any Party hereto to the other (herein called "**Notice**") shall be in writing and delivered and addressed as follows:

If to Buyer:

> Snowflake Power, LLC
> 2525 East Camelback Rd.
> Suite 850
> Phoenix, AZ 85016

If to the Receiver:

> David M. Reaves
> Reaves Law Group
> 2999 N. 44th Street
> Suite 600
> Phoenix, AZ 85018

Each of the above addresses for Notice purposes may be changed by providing appropriate Notice hereunder. Notice shall be effective only upon actual receipt.

**10.6    Status of Receiver**

Buyer acknowledges that the Receiver is entering into this Agreement in its capacity as court appointed interim receiver and receiver and manager of the assets and undertakings of the Company and not in his personal capacity, and that Buyer will have recourse under or in connection with the terms, conditions, covenants, representations and warranties of this Agreement only against the Receiver in his capacity as such, with any obligations or liabilities of the Receiver hereunder to be satisfied solely from the assets of the Company and other assets subject to the Receivership Order and any order of the Bankruptcy Court, and Buyer will have no recourse against the Receiver in its personal capacity, nor any of the Receiver's attorneys, agents, or employees, under or in connection with the terms, conditions, covenants, representations and warranties of this Agreement.

**10.7    Governing Law**

This Agreement shall be governed by and construed in accordance with the laws of the State of Arizona without giving effect to its conflict-of-laws principles.

**10.8    Submission to Jurisdiction; Consent to Service of Process**

(a)    <u>Jurisdiction and Venue</u>.  Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 10.5. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance

of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)     Service of Process. Each of the Parties hereby consents to process being served by any Party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 10.5.

## 10.9   Entire Agreement; Amendments and Waivers

(a)     Entire Agreement. This Agreement, together with all Schedules and Exhibits hereto, which are incorporated herein by reference, the other Sale Documents and the Confidentiality Agreement constitute the entire agreement between and among the Parties hereto pertaining to the subject matter hereof and thereof and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties, and there are no warranties, representations or other agreements between or among the Parties in connection with the subject matter hereof or thereof except as set forth specifically herein or therein or contemplated hereby or thereby.

(b)     Amendment and Waiver. No supplement, modification or waiver of this Agreement shall be binding unless executed in writing by the Party to be bound thereby. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (regardless of whether similar), nor shall any such waiver constitute a continuing waiver unless otherwise expressly provided.

## 10.10   Release

In consideration of the agreements set forth in this Agreement, except as otherwise provided herein, Buyer and all of its employees, directors, officers, agents, representatives, predecessors, successors and assigns (individually and collectively, the "**Buyer Releasing Parties**"), hereby fully release, remise, and forever discharge CoBank and its employees, directors, officers, agents, representatives, predecessors, successors and assigns for, from, and against any and all claims, demands, causes of action, controversies, offsets, obligations, losses, damages and liabilities of every kind and character whatsoever, including, any action, omission, misrepresentation or other basis of liability founded either in tort or contract and the duties arising thereunder, that the Buyer Releasing Parties, or any one of more of them, may have based upon any claim existing at the moment immediately prior to Buyer's purchase of the Purchased Assets whether known or unknown, whether asserted or unasserted, by reason of any matter, cause or thing set forth in, relating to or arising out of, or in any way connected with or resulting from any Purchased Asset.

## 10.11   Binding Effect and Assignment; Severability; Bankruptcy Court Approval

(a)     Binding Effect and Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective permitted successors and permitted assigns, provided that neither this Agreement nor any of the rights, interests, or obligations hereunder may be assigned by any Party without the prior written consent of the other Party. It is the intent of the Parties that no third party beneficiary rights be created or deemed to exist in

29

favor or any Person not a party to this Agreement, other than as set forth in Section 10.10 or as otherwise expressly set forth in this Agreement or otherwise agreed in writing by the Parties.

(b)     Severability.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

(c)     Approval of Bankruptcy Court.  Notwithstanding anything herein to the contrary, all of the Company's and the Receiver's obligations under this Agreement are subject to approval of the Bankruptcy Court.

## 10.12  Multiple Counterparts

This Agreement may be executed in one or more counterparts, including facsimile and electronic portable document format ("pdf") counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

## 10.13  References and Construction

(a)     Whenever required by the context, and as used in this Agreement, the singular number shall include the plural, pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identification of the person may require, and the word "including" and words of like meaning shall mean "including, without limitation."  References to Sections and Articles mean Sections and Articles of this Agreement.

(b)     The provisions of this Agreement shall be construed according to their fair meaning and neither for nor against any Party hereto irrespective of which Party caused such provisions to be drafted.  Each of the Parties acknowledges that it has been represented by an attorney in connection with the preparation and execution of this Agreement.

(c)     This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

*[signature page follows]*

SF\762717.4

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**BUYER:**

**SNOWFLAKE POWER, LLC**

By:   Snowflake Holdings, LLC,
      a Delaware limited liability company

By: _____
Name:  Jahm Najafi
Title:   Authorized Representative


**RECEIVER:**

**DAVID M. REAVES, as the Receiver**

_____

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**BUYER:**

**SNOWFLAKE POWER, LLC**

By: _____
Name:
Title:


**RECEIVER:**

**DAVID M. REAVES, as the Receiver**

_____ , receiver

## ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS ASSIGNMENT AND ASSUMPTION AGREEMENT** (the "**Agreement**") is entered into as of _____, 2010 by and between Snowflake Power, LLC, a Delaware limited liability company ("**Assignee**"), and David M. Reaves, in his capacity as authorized representative (the "**Assignor**") for Snowflake White Mountain Power, LLC (the "**Company**").

**WHEREAS**, Company has entered into certain agreements listed on Schedule 1 hereof (the "**Purchased Contracts**");

**WHEREAS**, pursuant to an Asset Purchase Agreement between Assignee and Assignor dated as of September 9, 2010 (the "Purchase Agreement"), Assignor has agreed to sell certain assets of Company to Assignee and, as a portion of the consideration therefor, Assignee has agreed to assume Company's obligations under the Purchased Contracts arising from and after the date of this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants, representations, and undertakings in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**1.** **Definitions.** Capitalized terms not expressly defined in this Agreement shall have the meanings ascribed to them in the Purchase Agreement.

**2.** **Assignment and Assumption.** Effective as of the date hereof, Assignor assigns to Assignee, and Assignee assumes from Assignor, all obligations of Company with respect to the Purchased Contracts arising from and after the date of this Agreement.

**3.** **Further Assurances.** Each of the Parties shall execute and deliver such documents, and take such other action, as shall be reasonably requested by any other Party hereto in order to consummate the transactions contemplated hereby.

**4.** **Binding Effect and Assignment.** This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective permitted successors and permitted assigns, provided that neither this Agreement nor any of the rights, interests, or obligations hereunder may be assigned by any Party without the prior written consent of the other Party.

**5.** **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of Arizona without giving effect to its conflict-of-laws principles.

**6.** **Severability.** If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal

1

substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

7.    **Multiple Counterparts.** This Agreement may be executed in one or more counterparts, including facsimile and electronic portable document format ("pdf") counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

SF\762717.4

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed, as of the date first written above.

**BUYER:**

**SNOWFLAKE POWER, LLC**

By:   Snowflake Holdings, LLC,
       a Delaware limited liability company

      By: _____
           Name:
           Title:

**ASSIGNOR:**

**DAVID M. REAVES, as the Receiver**

_____

## Schedule 1

## Purchased Contracts

*[To include all contracts on Schedule 2.1(a)(v) as may have been modified prior to the Closing Date as provided in Section 2.1(a)(v).]*

## BILL OF SALE

This BILL OF SALE ("**Bill of Sale**"), dated _____, 2010, by David M. Reaves, in his capacity as authorized representative (the "**Receiver**") for Snowflake White Mountain Power, LLC (the "**Company**"). For good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, and as contemplated by that certain Asset Purchase Agreement dated as of September 9, 2010 (the "**Purchase Agreement**"), by and between Snowflake Power, LLC, a Delaware limited liability company ("**Buyer**") and the Receiver, the Receiver hereby sells, transfers, assigns, conveys, grants and delivers to the Buyer all of the Company's right, title and interest in and to all of the Purchased Assets, as defined in the Purchase Agreement, in accordance with and subject to the terms of the Purchase Agreement. Capitalized terms not expressly defined in this Bill of Sale shall have the meanings ascribed to them in the Purchase Agreement.

The Receiver covenants and agrees to execute and deliver further instruments of transfer and assignment and take such other actions as the Buyer may reasonably request to more effectively transfer, assign to and vest in the Buyer each of the Purchased Assets, all at the sole cost and expense of the Receiver.

This Bill of Sale is subject to the terms of the Purchase Agreement, the terms of which shall not be modified or altered in any way hereby. In the event of any conflict between this instrument and the Purchase Agreement, the provisions of the Purchase Agreement shall control.

This Bill of Sale shall be binding on the Receiver and inure to the benefit of the Buyer and its successors and assigns.

This Bill of Sale shall be governed by and construed in accordance with the laws of the State of Arizona without giving effect to its conflict-of-laws principles.

IN WITNESS WHEREOF, the undersigned has duly executed this Bill of Sale on the date first written above.

**RECEIVER:**

**DAVID M. REAVES, as the Receiver**

_____

**Exhibit C to Asset Purchase Agreement**

## Sale Procedures

Set forth herein are the bid procedures (the "Sale Procedures") to be employed with respect to the offer to purchase substantially all of the assets of Snowflake White Mountain Power, LLC (the "Company") submitted by Snowflake Power, LLC (the "Proposed Purchaser"). On July 9, 2010, David M. Reaves, in his capacity as court-appointed receiver and not in his personal capacity (the "Receiver") for the Company, caused the Company to file a voluntary petition for relief commencing a case in the United States Bankruptcy Court for the District of Arizona (the "Bankruptcy Court"), administered under Case No. 10-21604. The Receiver will seek entry of an order from the Bankruptcy Court authorizing and approving the proposed sale (the "Proposed Sale") to the Proposed Purchaser or to one or more other Qualified Bidders (defined below) that the Receiver may determine to have made the highest, best or otherwise financially superior offer. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Agreement (defined below).

## Asset Purchase Agreement

On September 9, 2010, the Receiver entered into an asset purchase agreement (the "Agreement") with the Proposed Purchaser. Pursuant to the Agreement, the Proposed Purchaser proposes to acquire free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon to the maximum extent permitted by Section 363 of the Bankruptcy Code (collectively, the "Liens"), substantially all of the Company's real and personal, tangible and intangible property and assets of any kind or nature whatsoever, and all proceeds, rents or profits thereof, including, but not limited to, accounts receivable, any and all claims and causes of action, all trade names, trademarks, copyrights, and other intellectual property and license rights owned by the Company (collectively, the "Purchased Assets"), provided, however, the Purchased Assets shall not include those certain assets expressly identified as "Excluded Assets" under the terms of the Agreement.

The purchase price (the "Purchase Price") to be paid by the Proposed Purchaser for the Purchased Assets shall be not less than $475,000, but is subject to adjustment prior to Closing in accordance with the terms of the Agreement. Also pursuant to the Agreement, at the Closing, the Proposed Purchaser shall assume from the Company and thereafter pay, perform or otherwise discharge in accordance with their respective terms and subject to the respective conditions thereof, the assumed liabilities (the "Assumed Liabilities").

## Expenses of Proposed Purchaser

Under the Agreement, the Company has agreed to pay certain expenses of the Proposed Purchaser under certain circumstances (the "Proposed Purchaser Expenses"). In the event that Proposed Purchaser is not the successful bidder in the sale of the Purchased Assets conducted pursuant to 11 U.S.C. § 363, then Company shall pay to Proposed Purchaser, on or about the closing date of the sale, $250,000 to cover Proposed Purchaser's costs, expenses and effort incurred in connection with this sale. The transaction contemplated by the Agreement is

subject to competitive bidding as set forth herein, and approval by the Bankruptcy Court pursuant to the Bankruptcy Code.

## The Bidding Process

The Receiver and his advisors shall (i) determine whether any person that submits a bid for the Purchased Assets is a Qualified Bidder (defined below), (ii) coordinate the efforts of Qualified Bidders in conducting their due diligence investigations, (iii) receive offers from Qualified Bidders, and (iv) negotiate in good faith any offers made to purchase the Purchased Assets (collectively, the "Bidding Process"). Any person that wishes to participate in the Bidding Process must be a Qualified Bidder. Neither the Receiver nor his representatives shall be obligated to furnish information of any kind whatsoever to any person that is not a Qualified Bidder.

## Participation Requirements

Any person that wishes to participate in the Bidding Process (a "Potential Bidder") must become a "Qualified Bidder." As a prerequisite to becoming a Qualified Bidder (and thus, among other things, prior to being able to conduct due diligence), a Potential Bidder must deliver (unless previously delivered) to the Receiver, not later than 10 business days after entry of the order approving these Sale Procedures (the "Sale Procedures Order"):

(i)     An executed confidentiality agreement in form and substance acceptable to the Receiver; and

(ii)    Sufficient information, as requested by the Receiver, to allow the Receiver to determine that the Potential Bidder has the financial wherewithal to close the sale transaction, including, but not limited to, current audited financial statements (or such other form of financial disclosure and credit-quality support or enhancement acceptable to the Receiver) of the Potential Bidder or of those entities that will guarantee the obligations of the Potential Bidder.

A Potential Bidder that delivers the documents described in subparagraphs (i) - (ii), and that the Receiver determines is reasonably likely (based on financial information submitted by the Potential Bidder, the availability of financing, experience and other considerations deemed relevant by the Receiver), to submit a bona fide offer and to be able to consummate a sale if selected as a Successful Bidder (defined below) is a "Qualified Potential Bidder." No later than seven business days after a Potential Bidder delivers all of the materials required by subparagraphs (i) - (ii) above, the Receiver shall determine, and shall notify the Potential Bidder, if such Potential Bidder is a Qualified Potential Bidder.

## Due Diligence

The Receiver may afford any Qualified Potential Bidder the time and opportunity to conduct reasonable due diligence; provided, however, that the Receiver shall not be obligated to furnish any due diligence information after the Bid Document Deadline (as hereinafter defined). The Receiver will designate an employee or other representative to coordinate all reasonable

requests for additional information and due diligence access from such Qualified Potential Bidders. Neither the Receiver nor any of his representatives are obligated to furnish any information to any person other than a Qualified Potential Bidder.

## Pre-Bid Document Requirements

All Qualified Potential Bidders must submit the following (unless such requirement is waived by the Receiver):

- A $500,000 good faith deposit ("Good Faith Deposit").

- Written evidence of a commitment for financing or other evidence of the ability to consummate the sale satisfactory to the Receiver with appropriate contact information for such financing sources (the "Financing Commitment").

- A blackline of the Agreement showing the Qualified Potential Bidder's proposed revisions to the form signed by the Proposed Purchaser and the Receiver; provided that in any event Section 2.2(b)(ii) of the Agreement shall be modified to read in full as follows:

  "(ii)  If this Agreement is validly terminated by the Receiver due to Buyer's breach, the Deposit Amount shall be applied to any damages incurred by the Receiver, without limitation of the Receiver's right to pursue Buyer for additional damages; and"

- Evidence of a filing with the Federal Energy Regulatory Commission of an application for authorization of disposition of jurisdictional facilities pursuant to Section 203(a)(1) of the Federal Power Act (collectively with the Financing Commitment and the blackline described above, the "Required Bid Documents"). The Receiver will assist in preparation of the portions of this application that relate to the disposing party.

## Required Bid Document Deadline

A Qualified Potential Bidder that desires to make a bid at the Sale Hearing (as defined below) shall deliver the Good Faith Deposit and the Required Bid Documents to David M. Reaves, 2999 N. 44th Street, Suite 600, Phoenix, AZ 85018 at least three business days prior to the Sale Hearing (the "Bid Document Deadline"). A Qualified Potential Bidder that meets all of the above requirements is a Qualified Bidder for the purposes of the Sale Hearing.

## Proposed Purchaser Qualified Bidder

The Proposed Purchaser is a Qualified Bidder. The Proposed Purchaser's offer to purchase the Purchased Assets as set forth in the Agreement is irrevocable until the earliest of (i) the day that the Purchased Assets have been sold pursuant to the closing of a sale approved by the Bankruptcy Court, (ii) 60 days after the conclusion of the Sale Hearing or such later date on which FERC shall have approved the Sale to the Proposed Purchaser under Section 203 of the

Federal Power Act or definitively denied such approval, and (iii) the date the Agreement is validly terminated in accordance with its terms.

<h3 style="text-align:center">"As Is, Where Is"</h3>

The sale of the Purchased Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Receiver, his agents or the Company's bankruptcy estate except to the extent set forth in the Agreement or the purchase agreement of another Successful Bidder. The Proposed Purchaser and each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Purchased Assets prior to making its bid, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Purchased Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Sale Procedures and the terms of the sale of the Purchased Assets to Proposed Purchaser or any other Successful Bidder shall be set forth in the Agreement or the other Successful Bidder's purchase agreement, as the case may be.

<h3 style="text-align:center">Purchased Assets to be Sold Free of Any And All Liens</h3>

Except as otherwise provided in the Agreement or another Successful Bidder's purchase agreement, all of the Company's right, title and interest in the Purchased Assets shall be sold free and clear of all Liens thereon and there against in accordance with Section 363 of the Bankruptcy Code.

<h3 style="text-align:center">Purchased Contracts</h3>

The Company (i) shall be required to pay all amounts determined by the Bankruptcy Court to be necessary to cure monetary defaults under the Purchased Contracts to the extent assigned to the Successful Bidder in connection with the sale and if any such cure amount has not been finally determined by the Bankruptcy Court, or otherwise agreed upon by the applicable parties, then the Company shall escrow all amounts necessary to pay anticipated claims, and (ii) shall have otherwise complied with Section 365(b) of the Bankruptcy Code.

<h3 style="text-align:center">Sale Hearing and Auction</h3>

If more than one Qualified Bidder is identified, the Receiver and the Bankruptcy Court shall conduct an auction (the "Auction") with respect to the Purchased Assets at a hearing to be held on or as soon as possible after September 27, 2010 (the "Sale Hearing"). The Receiver shall notify all Qualified Bidders of the time and place of the Auction and Sale Hearing.

Only a Qualified Bidder is eligible to participate at the Auction. During the Auction, bidding shall begin initially with the Proposed Purchaser's initial Purchase Price and shall subsequently continue in $500,000 increments until no Qualified Bidder is willing to make

9

another bid.  Other than otherwise set forth herein, the Bankruptcy Court may conduct the Auction in the manner it determines will result in the highest, best or otherwise financially superior offer(s) for the Purchased Assets.

Upon conclusion of the bidding, the Auction shall be closed, and the Receiver shall (i) immediately review each bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Proposed Sale, and (ii) identify the highest, best or otherwise financially superior offer for the Purchased Assets (the "Successful Bid", and the entity or entities submitting such Successful Bid, the "Successful Bidder"), which highest, best or otherwise financially superior offer will provide the greatest amount of net value to the Company's bankruptcy estate, and advise the Qualified Bidders and counsel to the Proposed Purchaser of such determination.  If the Proposed Purchaser's final bid is deemed to be highest and best at the conclusion of the Auction, the Proposed Purchaser will be the "Successful Bidder," and such bid, the "Successful Bid."

Prior to the conclusion of the Sale Hearing, the Court shall identify the Successful Bid and the Successful Bidder.  At that time, the Bankruptcy Court shall hear evidence regarding whether the Successful Bid shall be approved.  All interested parties reserve their right to object to the Receiver's selection of the Successful Bidder.

Following the approval of the sale of the Purchased Assets to the Successful Bidder at the Sale Hearing, if such Successful Bidder fails to consummate an approved sale within 25 days after entry of the Sale Order, the Receiver shall be authorized, but not required, to deem the next highest or otherwise best bid, as disclosed at the Sale Hearing, the Successful Bid, and the Receiver shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting such bid without further order of the Bankruptcy Court.

### Return of Good Faith Deposit

Good Faith Deposits of the Successful Bidder shall be applied to the purchase price of such transaction at closing as provided in Section 2.2(b) of the Agreement.  Good Faith Deposits of all other Qualified Bidders shall be held in a non interest-bearing escrow account until five days after closing of the transactions contemplated by the Successful Bid, and thereafter returned to the respective bidders.  If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Receiver shall be entitled to retain the Good Faith Deposit as part of its damages resulting from the breach or failure to perform by the Successful Bidder.

### Modifications

The Receiver may (i) determine, which bid, if any, is the highest, best or otherwise financially superior offer; and (ii) reject at any time before entry of an order of the Bankruptcy Court approving this sale any bid that is (A) inadequate or insufficient, (B) not in conformity with the requirements of the Bankruptcy Code, the Sale Procedures, or the terms and conditions of sale, or (C) contrary to the best interests of the Company, its bankruptcy estate and its creditors.  At or before the Sale Hearing, the Receiver may impose such other terms and

conditions as the Receiver may determine to be in the best interests of the Company's estate, its creditors and other parties in interest.

1

# REAVES LAW GROUP

A PROFESSIONAL CORPORATION

2999 North 44th Street,
Suite 600
Phoenix, Arizona 85018
Telephone (602) 241-0101
Facsimile (602) 241-0114

2

3

4

5

David M. Reaves, Receiver
State Bar No. 011677

6

7

8

IN THE UNITED STATES BANKRUPTCY COURT

9

FOR THE DISTRICT OF ARIZONA

10

| | |
|---|---|
| In Re: | Proceedings Under Chapter 11 |
| SNOWFLAKE WHITE MOUNTAIN POWER, LLC, | Case No. 2:10-bk-21604-CGC |
| Debtor. | **ORDER GRANTING RECEIVER'S MOTION FOR AUTHORITY TO SELL SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS AS A GOING CONCERN AND TO ASSUME AND ASSIGN OR REJECT CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO** |
| | Related DE: |

11

12

13

14

15

16

17

18

Upon consideration of the "Receiver's Motion For Authority To Sell Substantially All Of The Debtor's Assets As A Going Concern And To Assume And Assign or Reject Certain Executory Contracts And Unexpired Leases Related Thereto" (the "Sale Motion")[1] of David M. Reaves, in his capacity as Receiver (the "**Receiver**") and authorized representative of Snowflake White Mountain Power, LLC (the "**Debtor**" or the "**Company**") seeking entry of an Order authorizing (i) the sale of substantially all of the Debtor's assets, as more fully described in the Sale Motion (the "**Property**"), free and clear of Interests and Claims (the "**Sale**"); and (ii) the

19

20

21

22

23

24

25

---

[1] Capitalized terms not defined herein shall have meanings ascribed to them in the Sale Motion.

11933272

1

SF\762198.2

11966888

assumption and assignment or rejection, as applicable, of certain executory contracts and unexpired leases, including all Permits relating to the Business to the extent transferable (the "**Purchased Contracts**") pursuant to the procedures provided herein; the Receiver having agreed to sell the Purchased Assets to Snowflake Power, LLC or its designee or designees (the "**Purchaser**"), subject to better and higher offers, on the terms and conditions provided in the Sale Motion; the Court having conducted an auction (the "**Auction**") of the Purchased Assets pursuant to the previously approved Bidding Procedures; the Purchaser having submitted the Successful Bid in the amount of $_____ (the "**Sale Price**") to be paid in cash at closing; the Successful Bid having been determined by the Receiver and the Court to be the highest and best bid at the Auction for the Property; a final hearing on the Sale Motion having been held immediately following the Auction (the "**Sale Hearing**"); all interested parties having been given adequate notice of, and having been afforded an opportunity to be heard with respect to, the Sale Motion; the Court having reviewed and considered (i) the Sale Motion; (ii) the objections thereto, if any; and (iii) the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing; it appearing that the relief requested in the Sale Motion and authorization of the sale of the Purchased Assets and the assumption and assignment or rejection, as applicable, of the Purchased Contracts is in the best interests of the Debtor, its estate, creditors, and other parties in interest; and based on the Sale Motion, the statements of counsel, the record of the Sale Hearing and the Auction and the entire record in this case, the Court having determined and concluded as follows and that good cause exists therefor, makes the following findings of fact and conclusions of law:[2]

    1.      The Debtor operates a 24-megawatt (nameplate) biomass-fired power plant (the "**Plant**") located in Snowflake, Arizona (the "**Business**").

---

[2] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed. R. Bankr. P. 7052.

2. On April 5, 2010, CoBank, ACB ("**CoBank**"), a secured creditor of the Company, filed suit against the Company and certain other parties in the Superior Court of the State of Arizona (the "**Receivership Court**"), in case number CV2010-010974, which suit (the "**Receivership Case**") included an application for the appointment of the Receiver as receiver over certain assets of the Company (as further defined in the Receivership Order, the "**Property**"), and pursuant to which a Stipulated Order Appointing Receiver ("**Receivership Order**") was entered by the Receivership Court on April 7, 2010;

3. On July 9, 2010, the Receiver and CoBank filed an "Application for Temporary Restraining Order Against Salt River Project Agricultural Improvement and Power District or in the alternative For Authority of the Receiver to File a Voluntary Petition for Chapter 11 Bankruptcy for Snowflake White Mountain Power, LLC" (the "**Application**") in the Receivership Case;

4. On July 9, 2010, the Receivership Court entered an "Order Authorizing the Receiver to File a Chapter 11 Petition on Behalf of Snowflake White Mountain Power, LLC" (the "**State Court Order**"), which denied the application for a temporary restraining order, but granted the Receiver authority to file a bankruptcy petition for the Debtor;

5. On July 9, 2010, the Receiver filed a Voluntary Petition for Chapter 11 Bankruptcy in the United States District Court, District of Arizona (the "**Bankruptcy Court**") on behalf of Snowflake White Mountain Power, LLC, commencing Bankruptcy Case No. 2:10-21694-CGC (the "**Bankruptcy Case**");

6. On July 13, 2010, the Bankruptcy Court granted "CoBank's Motion to Excuse Turnover of the Receiver" on an interim basis ("**Excuse Order**"), authorizing the Receiver to continue to operate, possess, and control the Purchased Assets pending further order of the Bankruptcy Court;

7. Pursuant to the Receivership Order and the Excuse Order, the Receiver is authorized to sell or otherwise dispose of the Property;

8. Pursuant to the Excuse Order, the Receiver manages the affairs of the Debtor's

11933272
SF\762198.2
11966888

estate and exercises all of the rights and powers of a trustee serving in a case under chapter 11 of the Bankruptcy Code in accordance with 11 U.S.C. § 1107.  Among those rights and powers are (i) the right and power to sell property of the Debtor's estate out of the ordinary course of business, free and clear of liens and interests; and (ii) the right and power to assume and assign or reject unexpired leases and executory contracts, subject to approval by this Court after appropriate notice and an opportunity for a hearing.  *See* 11 U.S.C. §§ 363(b), 363(f), 365(a), 365(f) and 1107;

9.      This Court has core subject matter jurisdiction to hear and resolve the Sale Motion pursuant to 28 U.S.C. §§ 1334(b), 1334(e), 157(b)(2)(A), 157(b)(2)(M), 157(b)(2)(N), 157(b)(2)(O) and applicable local rules and General Orders regarding the referral to this Court of cases under title 11 of the United States Code;

10.      The Purchased Assets include the following, without limitation:

(a)      all deposits, prepayments, refunds, or pre-paid costs, fees, premiums and expenses;

(b)      all tangible personal property used in the Business and located at the Real Property;

(c)      the rights to and in the telephone numbers, internet web sites and internet domain names presently used by the Company in the Business and all software and software licenses used solely in the Business to the extent transferable;

(d)      all financial and business records, including customer lists and files and data and databases (whether in print, electronic, or other format) primarily relating to the Business and personnel records of Transferred Employees, to the extent not included among the Excluded Assets;

(e)      all contracts listed on Schedule 2.1(a)(v) (the "**Purchased Contracts**");

(f)      all fuel inventory and spare parts;

(g)      all patents, patent applications, patent rights, trademarks, trademark applications, trade names, product names, service marks, copyrights, copyright applications domain name registration, know-how and other intellectual property related to the Business;

(h)      all goodwill with respect to the Purchased Assets and the Business;

(i)      all insurance benefits (including rights and proceeds thereof) (A) to the extent primarily relating to any damage to or destruction or other loss of any of the Purchased Assets or the Business, in any such case occurring from and between the Effective Date and the Closing Date, whether received or receivable by or on behalf of the Company on or after the Effective

11933272

SF\762198.2

11966888

Date, unless expended on repairing or replacing any such Purchased Asset before the Closing Date, and (B) paid or payable under the Company Insurance Policies;

(j)     all claims of the Company against any Person primarily relating to the Purchased Assets or the Business;

(k)     all Permits relating to the Business to the extent transferable (the "**Purchased Permits**");

(l)     all cash, cash equivalents and uncashed checks in favor of the Company received prior to the Closing Date; and

(m)     all Accounts Receivable outstanding as of the Closing and any other Current Assets not expressly set forth above.

11.     As evidenced by the certificate of service previously filed with the Court, and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate and sufficient notice of the Bidding Procedures Motion, the Bidding Procedures, the Sale Motion, the Auction, the Sale Hearing, the Sale, and the assumption and assignment to the Purchaser, or the rejection, as applicable, of the Purchased Contracts through the Contract Notice has been provided or otherwise excused in accordance with 11 U.S.C. §§ 102(1), 105(a), 363, and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, 9006, 9007 and 9014; (ii) such notice was reasonable, sufficient, and appropriate under the circumstances; and (iii) no other or further notice of the Sale Motion, the Auction, the Sale Hearing, the Sale, or the assumption and assignment, or rejection, as applicable, of the Purchased Contracts is or shall be required;

12.     A reasonable opportunity to object or be heard with respect to the Sale Motion and the assumption and assignment, or the rejection, as applicable, of the Purchased Contracts has been afforded to all interested persons and entities, including: (i) the United States Trustee; (ii) all entities reasonably known by the Receiver to assert an Interest in the Purchased Assets to be sold, including but not limited to Catalyst and AZ Biomass, LLC; (iii) the creditors identified on the Debtor's schedules or that have filed proofs of claim; (iv) all parties to Purchased Contracts; and (vi) all parties that have previously requested notice in the Debtor's bankruptcy proceedings;

13.     As demonstrated by (i) the affidavit(s) filed with the Court prior to the Sale

11933272
SF\762198.2
11966888

Hearing; (ii) the evidence proffered or adduced at the Sale Hearing; and (iii) the representations of counsel made on the record at the Sale Hearing and in the Sale Motion, the Receiver has adequately marketed the Property, and conducted the Sale process in substantial compliance with the Procedures Order;

14. The Receiver has full corporate power and authority on behalf of the Company to execute all such documents necessary to complete the Sale;

15. The Receiver has demonstrated sound business justifications for the Sale pursuant to 11 U.S.C. § 363(b) prior to, and outside the context of, a plan of reorganization in that, among other things, the fact that there are insufficient funds to permit the Debtor to continue to operate for any length of time makes the proposed Sale the best available outcome for the Debtor, the Debtor's estate and its creditors;

16. The Sale was negotiated, proposed and entered into by the Debtor and the Purchaser without collusion, in good faith, and from arms'-length bargaining positions. The Purchaser is a good faith purchaser under 11 U.S.C. § 363(m) and, as such, is entitled to all of the protections afforded thereby;

17. The Successful Bid (i) is fair and reasonable; (ii) is the highest and best offer for the Property; (iii) is in the best interests of the Debtor, the Debtor's estate and its creditors; and (iv) constitutes reasonably equivalent value and fair consideration for the Purchased Assets under the Bankruptcy Code and under the laws of the United States and of any state, territory, or possession, or of the District of Arizona, and the Sale does not and will not constitute a preferential transfer or fraudulent conveyance under the Bankruptcy Code and under the laws of the United States, any state, territory or possession, or the District of Arizona;

18. The transfer of the Purchased Assets to the Purchaser will be a legal, valid, and effective transfer of the Property, and will vest the Purchaser with all right, title and interest of the Debtor and the Necessary Affiliates in the Purchased Assets free and clear of all Interests and Claims, including, but not limited to, (i) all liens, claims, security interests, and encumbrances of any kind or character; (ii) those that purport to give to any party a right or option to effect any

11933272

SF\762198.2
11966888

forfeiture, modification, right of first refusal, or termination of the Debtor's interest in the Property, or any similar rights; and (iii) relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Business prior to the Closing Date;

19. The Purchaser would not have agreed to the Sale and will not consummate the transactions contemplated thereby, thus adversely affecting the Debtor, its estate, and its creditors, if the Sale were not free and clear of all Interests and Claims of any kind or nature whatsoever, or if the Purchaser would, or in the future could, be liable for any of the Interests or Claims and, if the assumption and assignment, or rejection, as applicable, of the Purchased Contracts were not approved under 11 U.S.C. § 365;

20. The Receiver may sell the Purchased Assets free and clear of all Interests and Claims of any kind or nature whatsoever because, in each case, one or more of the standards set forth in 11 U.S.C. § 363(f) has been satisfied. CoBank has consented to the Sale. Those holders of Interests or Claims who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented pursuant to 11 U.S.C. § 363(f)(2). The objections of those holders of Interests or Claims who did object and have not withdrawn their objections are without merit, are overruled, or otherwise fall within one or more of the other subsections of 11 U.S.C. § 363(f).

21. CoBank holds a valid and existing first priority lien on the Purchased Property in an amount that exceeds the Sale Price.

22. The Receiver has demonstrated that it is an exercise of his sound business judgment to assume and assign to the Purchaser, or reject, as applicable, the Purchased Contracts in connection with the consummation of the Sale, and the assumption and assignment, or the rejection, as applicable, of the Purchased Contracts is in the best interests of the Debtor, its estate, and its creditors; and

23. Authorization of the Sale, the assumption and assignment, or rejection, as applicable, of the Purchased Contracts, and consummation of the Sale at this time is in the best interests of the Debtor, its creditors, its estate and other parties in interest.

**NOW THEREFORE, BASED UPON THE FOREGOING FINDINGS OF FACT, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT**:

A.     The Sale Motion is granted as further described herein.

B.     All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits.

C.     Pursuant to 11 U.S.C. § 363(b), the Receiver is authorized to consummate the Sale pursuant to and in accordance with the terms and conditions provided in the Sale Motion and as further provided herein.[3]

D.     The Receiver is authorized to execute and deliver, and is empowered to perform under, consummate, and implement, all instruments and documents that may be reasonably necessary or desirable to implement the Sale, and to take all further actions as may be requested by the Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser or reducing to possession, the Purchased Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by this Sale Order.

E.     The Purchaser and the Receiver shall be bound by the terms of that certain Asset Purchase Agreement dated _____ between David M. Reaves and Snowflake Power, LLC.

F.     Except as expressly permitted or otherwise specifically provided for in this Sale Order, pursuant to 11 U.S.C. §§ 105(a) and 363(f), the Purchased Assets shall be transferred to the Purchaser at the Closing, and as of the Closing, shall be free and clear of all Interests and Claims, including, but not limited to: (i) all liens, claims, security interests, and encumbrances of any kind or character; (ii) those that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Debtor's or the Purchaser's

---

[3] To the extent the terms of the Sale Motion are inconsistent with the terms of this Sale Order, the terms of this Sale Order shall control.

11933272

SF\762198.2
11966888

8

interest in the Purchased Assets, or any similar rights; and (iii) relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Business prior to the date Closing Date.

G.     Except as expressly permitted or otherwise specifically provided for in this Sale Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade and other creditors holding Interests or Claims of any kind or nature whatsoever against or in the Debtor or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtor, the Purchased Assets or the operation of the Purchased Assets prior to the Closing Date, or the transfer of the Purchased Assets to the Purchaser (including any rights of first refusal), hereby are forever barred, estopped, and permanently enjoined from asserting against the Purchaser, its successors or assigns, its property, or the Property, such persons' or entities' Interests or Claims.

H.     The transfer of the Purchased Assets to the Purchaser pursuant to the Sale shall constitute a legal, valid and effective transfer of the Property, and shall vest the Purchaser with all right, title and interest of the Debtor in and to the Purchased Assets free and clear of all Interests and Claims of any kind or nature whatsoever, other than the Assumed Liabilities[4], with such liens, claims, interests and encumbrances transferring and attaching to the proceeds of the Sale with the same validity and priority as such liens, claims, interests and encumbrances had in the Purchased Assets immediately prior to the consummation of the Sale.

I.     The Receiver is authorized to pay CoBank through escrow the entire net proceeds of the Sale after deducting reasonable expenses and closing costs.

J.     On the Closing Date of the Sale, each of the Debtor's creditors or other holders

---

[4] As defined in the Sale Motion.

of an Interest is authorized and directed to execute such documents and take all other actions as may be necessary to release its Interests or Claims in the Purchased Assets, if any, as such Interests or Claims may have been recorded or may otherwise exist.

K.      If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing Interests or Claims shall not have delivered to the Receiver prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Interests which the person or entity has with respect to the Debtor or the Purchased Assets or otherwise, then (i) the Receiver and the Purchaser are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Property; and (ii) the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Interests or Claims in or against the Purchased Assets of any kind or nature whatsoever.

L.      Each recorder of deeds or similar official for any city, county or governmental unit in which deeds or other instruments of transfer for any of the Purchased Assets are to be recorded is hereby ordered and directed to accept the deeds or other instruments of transfer specified in the immediately preceding paragraph for recording, and promptly to record such deeds or other instruments of transfer.

M.      Subject to and conditioned upon the Closing of the Sale, (i) the Receiver's assumption and assignment to the Purchaser, or rejection, as applicable, of the Purchased Contracts to the Purchaser, is hereby approved pursuant to 11 U.S.C. §§ 105(a) and 365; (ii) the Receiver is hereby authorized, in accordance with 11 U.S.C. §§ 105(a) and 365, to (x) assume and assign to the Purchaser, effective upon the Closing of the Sale, the Purchased Contracts to be assumed and assigned free and clear of all Interests and Claims of any kind or nature whatsoever; and (y) execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer such Purchased Contracts to the Purchaser, and (iii) all defaults

11933272

10

SF\762198.2
11966888

under the Purchased Contracts are deemed cured.

N.    The non-Debtor parties to the Purchased Contracts shall be barred, estopped and permanently enjoined from asserting any claim against the Purchaser for any pre-closing obligations, including monetary obligations, that are not Assumed Liabilities.

O.    Except as otherwise provided in this Sale Order or any other applicable Order of this Court, all rights and remedies of any non-Debtor party or the Purchaser under any of the Purchased Contracts assumed and assigned at the Closing (together, the "**Rights and Remedies**") are fully preserved and shall be fully enforceable after the Closing against the Purchaser or the non-Debtor party, as applicable, unless such Rights and Remedies are or were expressly waived or modified in a separate agreement or on the record at the Auction or the Sale Hearing.

P.    This Sale Order (i) shall be effective as a determination that, on the Closing Date, all Interests and Claims of any kind or nature whatsoever existing as to the Debtor or the Purchased Assets prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected; and (ii) shall be binding upon and shall govern the acts of all entities, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Property.

Q.    Each and every federal, state and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by this Sale Order.

R.    All persons and entities who are presently, or on the Closing Date may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of

the Purchased Assets to the Purchaser on the Closing Date.

S. Except as expressly permitted or otherwise specifically provided for in this Sale Order, the Purchaser shall have no liability or responsibility for any liability or other obligation of the Debtor arising under or related to the Purchased Assets or the operation thereof.

T. This Court retains jurisdiction to enforce and implement the terms and provisions of the Sale Motion and this Sale Order, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to (i) compel delivery of the Purchased Assets to the Purchaser; (ii) compel delivery of the purchase price or performance of other obligations owed to the Debtor; (iii) resolve any disputes arising under or related to the Sale, except as otherwise provided therein; and (iv) interpret, implement, and enforce the provisions of this Sale Order.

U. The transactions contemplated by the Sale are undertaken by the Purchaser in good faith, as that term is used in 11 U.S.C. § 363(m), and the Purchaser acted in good faith and is a good faith purchaser within the meaning of 11 U.S.C. § 363(m), and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to the Purchaser, unless such authorization is duly stayed pending such appeal prior to the Closing. The Purchaser is a purchaser in good faith of the Property, and the Purchaser is entitled to all of the protections afforded by 11 U.S.C. § 363(m).

V. The failure specifically to include any particular terms of the Sale, as provided in the Sale Motion, in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the terms of the Sale as provided in the Sale Motion be authorized and approved in their entirety.

W. The terms of the Sale and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by the Debtor and the Purchaser, and in accordance with the terms thereof, without further Order of the Court, provided that any such modification, amendment or supplement does

not have a material adverse effect on the Debtor's estate.

X.      Except as provided in the Sale Motion, this Sale Order, or other Order of this Court, after the Closing, the Debtor and its estate shall have no further liabilities or obligations with respect to any Assumed Liabilities and all holders of such claims are forever barred and estopped from asserting such claims against the Debtor, its successors or assigns, its property or the Property.

Y.      The Court finds that there is good cause to waive the 14-day stay under Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure, because such a stay would make it impossible for the Sale to close before the deadlines set by the parties. Accordingly, this Sale Order shall not be stayed for 14 days after the entry of the Sale Order and shall be effective and enforceable immediately upon entry.

DATED AND SIGNED ABOVE.

11933272
SF\762198.2
11966888

# Schedule 2.1(a)(v)

# Purchased Contracts

1) **Catalyst Paper**
   a) Abitibi Lease Agmt (09-14-2005)
   b) Waiver of Surface Rights (8-31-2006)
   c) Memorandum of Ground Lease (09-01-2006)
   d) Consent and Agreement (09-01-2006)
   e) Abitibi Second Amendment to Lease Agmt (08-02-2007)
   f) Abitibi Third Amendment to Lease Agmt (08-23-2007)
   g) First Amendment to Memo of Ground Lease and Notice of Easement Rights (09-20-2007)
   h) First Amendment to Waiver of Surface Rights (09-20-2007)
   i) Bill of Sale Ownership Interest (02-06-2008)
   j) Interconnection Facilities Ownership (02-06-2008)
   k) First Amendment to Consent and Agreement (04-10-2008)
   l) Lease Amendment #4 (12 31 08)
   m) Settlement and Release Agreement (12-31-2008)
   n) CP Termination Letter & Agreement (07-31-09)

2) **Power Purchase Agreements & Amendments with Arizona Power Services**
   a) Master Power Purchase and Sale Agreement (08-06-2005)
   b) APS Point-to-Point Transmission Service (07-10-2006)
   c) Amended and Restated Transaction Confirmation APS (08-16-2006)
   d) APS Large Generator Interconnection Agreement (11-01-2006)
   e) APS Electric Supply Agreement (01-10-2008)
   f) Electric Supply Agreement (Amended) (06-06-2008)
   g) Proposed One-year APS agreement for first 10 MWh (09-1-2010)
   h) Proposed Interconnection Agreement with APS

3) **Cooley Forest Products Processing Agreement**
4) **Round Valley Agreement**
5) **Future Forest Sales Agreement 2-26-10**
6) **JT Grinding Agreement**

## Schedule 2.1(c)(iv)

## Employees and Compensation

**1) Accrued PTO Payable 07/31/2010 SWMP**

**2) Lagerhausen Severance Agreement**

**3) Employee Roster (Current Compensation Rates)**

**4) Other benefits provided to employees**

**Snowflake White Mountain Power**

**Employee PTO Accruals as of July 31, 2010**

| 7/31/10 | | | | | | |
|---|---|---|---|---|---|---|
| **Employee** | **Department** | **Hrly** | **Rate of Pay** | **PTO Rate** | **PTO Available** | **PTO Payout** |
| Borota, Jack | Operations | $ | 25.00 | 3.69 | 55.75 | $ 1,393.75 |
| Brye, Eric C | Operations-Supervisor | $ | 33.65 | 4.62 | 83.5 | $ 2,810.10 |
| Byars, Jason | Operations | $ | 14.00 | 3.69 | 41.43 | $ 580.02 |
| Clodfelter, Cecil | Operations | $ | 31.00 | 3.69 | 30.11 | $ 933.41 |
| Coplan, Martin K | Operations | $ | 30.00 | 3.69 | 60.87 | $ 1,826.10 |
| Geiger, Leland | Trucking | $ | 18.03 | 3.69 | 28.77 | $ 518.72 |
| Goshorn, Lee A | Operations | $ | 35.00 | 3.69 | 72.87 | $ 2,550.45 |
| Halter, Leoni C | Operations | $ | 15.38 | 4.62 | 116.57 | $ 1,793.38 |
| Harrington, Robert J | Operations | $ | 21.00 | 3.69 | 64.25 | $ 1,349.25 |
| Henagar, Jerrel M | Operations | $ | 34.00 | 3.69 | 38.12 | $ 1,296.08 |
| Hildebrand, Daniel H | Operations | $ | 60.10 | 4.62 | 39.12 | $ 2,350.96 |
| Howard, George | Operations | $ | 21.00 | 3.69 | 66.28 | $ 1,391.88 |
| Hunt, Ross | Operations | $ | 37.00 | 3.69 | 68.87 | $ 2,548.19 |
| Kelton, Bo J | Operations | $ | 30.00 | 3.69 | 60.87 | $ 1,826.10 |
| Lopez, Tyler | Operations | $ | 30.00 | 3.69 | 60.87 | $ 1,826.10 |
| Obray, Brody G | Operations | $ | 30.00 | 3.69 | 68.25 | $ 2,047.50 |
| Owens, Matthew K | Operations | $ | 17.00 | 3.69 | 72.87 | $ 1,238.79 |
| Owens, Ross D | Operations | $ | 21.00 | 3.69 | 44.25 | $ 929.25 |
| Preston, Jonathan | Operations | $ | 14.00 | 3.69 | 53.00 | $ 742.00 |
| Reidhead, Jonathan S | Operations | $ | 37.00 | 3.69 | 72.87 | $ 2,696.19 |
| Scarbrough, Richard L | Operations - Supervisor | $ | 26.00 | 3.69 | 64.57 | $ 1,678.82 |
| Shoudt, Michael J | Operations | $ | 38.00 | 3.69 | 72.87 | $ 2,769.06 |
| Stevens, Craig P | Operations - Supervisor | $ | 37.50 | 4.62 | 76.68 | $ 2,875.50 |
| Stevens, Garry G | Operations - Supervisor | $ | 55.29 | 4.62 | 90.55 | $ 5,006.37 |
| Stevens, Terry | Operations | $ | 17.00 | 3.69 | 22.11 | $ 375.87 |
| Ulrich, Edward J | Operations - Supervisor | $ | 28.85 | 4.62 | 86.35 | $ 2,490.87 |
| Whitmire, Carol | Green Waste | $ | 10.00 | 0.00 | 0.00 | $ - |
| Whitmire, Koren | Operations | $ | 14.00 | 3.69 | 27.53 | $ 385.42 |
| Wood, Tyler | Operations | $ | 22.00 | 3.69 | 80.25 | $ 1,765.50 |
| | | | | | | $ 49,995.63 |

**Snowflake White Mountain Power**

**Employee Compensation Roster as of August 31, 2010**

| Employee | Part-Time/Full-Time | Job Title | Hire Date | Annual Salary | Hourly Rate |
|---|---|---|---|---|---|
| Borota, Jack | Full-time | Mechanic / Millwright | 08/10/2009 | | 25.00 |
| Brye, Eric C | Full-time | EH&S Manager | 08/17/2009 | 70,000.00 | |
| Byars, Jason | Full-time | Mechanic | 06/30/2008 | | 20.00 |
| Campos, Jesus J | Full-time | Oiler / Maintenance | 08/30/2010 | | 16.00 |
| Clodfelter, Cecil | Full-time | Electrical Mechanic | 10/26/2009 | | 31.00 |
| Coplan, Martin K | Full-time | Asst Control Operator | 08/31/2009 | | 30.00 |
| Goshorn, Lee A | Full-time | Control Operator | 08/31/2009 | | 35.00 |
| Harrington, Robert J | Full-time | Dozer Operator | 08/10/2009 | | 21.00 |
| Howard, George | Full-time | Mechanic / Millwright | 09/19/2008 | | 21.00 |
| Hunt, Ross | Full-time | Control Operator | 08/31/2009 | | 37.00 |
| Kelton, Bo J | Full-time | Asst Control Operator | 08/31/2009 | | 30.00 |
| Lopez, Tyler | Full-time | Asst Control Operator | 08/31/2009 | | 3.00 |
| Obray, Brody G | Full-time | Asst Control Operator | 08/10/2009 | | 30.00 |
| Owens, Ross D | Full-time | Sludge / Bottom Ash Clean Up | 08/10/2009 | | 21.00 |
| Preston, Jonathan | Full-time | Water Truck Operator | 08/05/2009 | | 14.00 |
| Reidhead, Jonathan S | Full-time | Control Operator | 08/31/2009 | | 37.00 |
| Scarbrough, Richard L | Full-time | Mechanic Manager | 08/17/2009 | | 26.00 |
| Shoudt, Michael J | Full-time | Control Operator | 08/31/2009 | | 38.00 |
| Stevens, Craig P | Full-time | Maint. Manager - SWMP | 07/13/2009 | 78,000.00 | |
| Stevens, Garry G | Full-time | General Manager - SWMP | 06/01/2009 | 115,000.00 | |
| Stevens, Terry | Full-time | Administrative Assistant | 10/26/2009 | | 17.00 |
| Ulrich, Edward J | Full-time | Fuel Quality Control | 05/03/2009 | 60,000.00 | |
| Whitmire, Koren | Full-time | Utility Operator | 06/22/2008 | | 16.00 |
| Wood, Tyler | Full-time | Fuel Yard / Dozer | 08/10/2009 | | 22.00 |
| Geiger, Leland | Full-time | Driver | 11/03/2005 | | 18.03 |
| Halter, Leoni C | Full-time | Administrative Assistant | 06/22/2008 | 32,000.00 | |
| Hildebrand, Daniel H | Full-time | V.P. Operations | 11/09/2009 | 125,000.00 | |
| Whitmire, Carol | Part-time | Heber Green Waste Attendant | 04/06/2009 | | 10.00 |

# Other Benefits to Employees

1) Quarterly bonus paid to all plant employees based on production of the plant. Maximum bonus for the plant is set at $120,000 annually with $30,000 per quarter. The bonus is paid on a tiered point basis (based on 25 MWh) within 30 days after the end of a quarter.

2) Snowflake (through Renegy LLC) provides a match to all participating employees based on the following:
   - 100% match by the company on the first 3% of salary
   - 50% match by the company on the next 2% of salary
   - Paid the week after a normally scheduled payroll date

3) Medical, Dental and Vision insurance is provided to each eligible employee. The company subsidizes the premium based on the following chart in 2010.

| Benefit Costs 2010 | | Monthly Premium | Employer | Employee | % | Paycheck |
|---|---|---|---|---|---|---|
| Medical BCBS | EE only | 435.65 | 392.09 | 43.57 | 10% | 20.11 |
| | Emp + Sp | 914.87 | 686.15 | 228.72 | 25% | 105.56 |
| | Emp + Ch | 827.74 | 620.81 | 206.94 | 25% | 95.51 |
| | Family | 1306.95 | 980.21 | 326.74 | 25% | 150.80 |
| | | | | | | |
| Dental Guardian | EE only | 35.35 | 27.43 | 5.30 | 15% | 2.45 |
| | emp + sp | 61.69 | 48.86 | 14.19 | 23% | 6.55 |
| | emp + ch | 96.36 | 58.40 | 32.76 | 34% | 15.12 |
| | Family | 130.61 | 74.83 | 49.63 | 38% | 22.91 |
| | | | | | | |
| Eye Med Vision | EE only | 4.44 | 4.44 | 0.00 | 0% | 0.00 |
| | emp + sp | 8.40 | 8.40 | 0.00 | 0% | 0.00 |
| | emp + ch | 8.84 | 8.84 | 0.00 | 0% | 0.00 |
| | Family | 13.00 | 13.00 | 0.00 | 0% | 0.00 |

4) Snowflake White Mountain provides free uniforms to employees working in areas that are considered unclean (primarily mechanical / maintenance). The company also subsidizes for required foot wear once a year.

# Schedule 2.4(a)

## Current Assets / Liabilities

1) Current Assets / Liabilities as of July 31, 2010
2) Accounts Receivable Detail Schedule (Customer List) with Invoices
3) Accounts Payable Trade Detail Schedule (Vendor List)

# Snowflake White Mountain Power, LLC
# Balance Sheet
### As of July 31, 2010

|  | Jul 31, 10 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| 10000 · Unrestricted Cash | 455,845.11 |
| 10001 · Restricted Cash | 280,760.52 |
| 12100 · Accounts Receivable - Trade | 1,491,681.41 |
| 15140 · Prepaid Computer Maintenance | 1,120.00 |
| 15190 · Other Prepaid Expenses | 22,523.96 |
| **Total Current Assets** | 2,251,931.00 |
| **LIABILITIES & EQUITY** | |
| **Current Liabilities** | |
| 21100 · Accounts Payable - Trade | 440,989.40 |
| 22810 · Accrued Wages - Salaries | 85,121.88 |
| 22820 · Accrued Payroll Taxes | 23,610.41 |
| 22850 · Accrued Vacation | 49,995.63 |
| 23190 · Accrued Taxes - Other | 9,211.92 |
| **Total Current Liabilities** | 608,929.24 |

# Accounts Receivable as of July 31, 2010

| | |
|---|---|
| Salt River Project Agricultural Improvement & Power | $ 659,304.45 (Received 8/20/10) |
| Arizona Public Service Company | $ 832,376.96 (Received 8/20/10) |
| **Total Accounts Receivable** | **$1,491,681.41** |


**Renegy**
Enlightened Generation

## Power Purchase Statement
## July 2010

**Sold To:** Salt River Project Agricultural Improvement & Power District    **Date:**    8/9/2010
Attn: Accounts Payable
PO Box 52025
Phoenix, AZ 85072          Attn: Amy Koehler, Power Accounting  Services
                           Email: Amy.Koehler@srpnet.com

**Total MW Sold to SRP**

|  |  |
|---|---|
|  | **6,531** |

**Power Purchase Payments:**

| Tier One Energy | @ $100.95 | 6,531 | MWh | $ | 659,304.45 |
|---|---|---|---|---|---|
| **Total Payment Due to Renegy on August 20, 2010:** |  |  |  | **$** | **659,304.45** |

Payments based on the Second Amended & Restated Renewable Energy Purchase & Sale Agreement dated August 18, 2006 between Snowflake White Mountain Power and Salt River Project Agricultural Improvement and Power District

Please refer to the enclosed spreadsheet for detailed hourly power.

Please refer any questions to Tom Lagerhausen
Renegy at (480) 317-6011

Thank you for your business!

| **Please wire payments to:** |
|---|
| CoBank ACB<br>Greenwood Village, CO 80111<br>ABA 307088754<br>Account No. 002218187<br>For further credit to: Snowflake White Mountain Power |



**Renegy**
Enlightened Generation

### Power Purchase Statement
### July 2010

**Sold To:** Arizona Public Service Company          **Date:**     8/9/2010
Attn: Energy Settlements, MC 9860
400 North 5th Street
Phoenix, AZ 85004          Attn: Lorraine Ellison 602.250.3880
          Email: POWERS@apsc.com

Total MW Sold to Arizona Public Service Company:

                                                                    **10,256**

**Power Purchase Payments:**

Amended PPA Energy Payment          10,256  MWH @ $81.16          MWh          $          832,376.96

**Total Payment Due to Renegy on August 20, 2010:**          $          832,376.96

Payments based on the Confirmation Agreement dated November 9, 2007 between Snowflake White Mountain
Power and Arizona Public Service Company

Please refer to the enclosed spreadsheet for detailed hourly power.

Please refer any questions to Tom Lagerhausen, Vice President of Finance
Renegy at (480) 317-6011

Thank you for your business!          **Please wire payments to:**

          CoBank ACB
          Greenwood Village, CO 80111
          ABA 307088754
          Account No. 002218187
          For further credit to: Snowflake White Mountain Power

# Snowflake White Mountain Power, LLC
## Vendor Balance Summary
### As of July 31, 2010

| VENDOR NAME | Jul 31, 10 |
| --- | ---: |
| 5K Equipment Services | 0.00 |
| A-1 Glass And Mirror Inc | 0.00 |
| Airgas Safety Inc | 0.00 |
| Airgas West | 43.41 |
| Airtech West | 0.00 |
| Alan Jacobson & Associates | 0.00 |
| All Brands Equipment Repair | 0.00 |
| All Covered, Inc | 0.00 |
| All Customs Exteriors, Inc | 0.00 |
| Alsco | 509.02 |
| Altech Environment USA | 4,410.00 |
| AMK Solutions, LLC | 0.00 |
| Andritz Seperation, Inc. Dept. 0312 | 0.00 |
| Applied Environmental Cons-DO NOT USE | 0.00 |
| APS - Parasitic | 0.00 |
| APS - Wheeling | 0.00 |
| Argus Management, LLC | 0.00 |
| Arizona Department Of Economic Security | 0.00 |
| Arizona Dept Of Environmental Quality | 0.00 |
| Arizona Mining Systems | 0.00 |
| Arizona Silica Sand Company | 0.00 |
| Arizona State University | 0.00 |
| Arizona Temporary Personnel | 0.00 |
| Arizona Wire Rope & Rigging | 0.00 |
| Arnold Machinery Company | 0.00 |
| Ashcom Technologies, Inc | 0.00 |
| Atomic Pest Control BL #8140 | 0.00 |
| B&W Distributors, LLC | 0.00 |
| Babcock & Wilcox Company | 10,878.18 |
| Bag Supply Company | 0.00 |
| Baghouse & Industrial Sheet Metal Service | 0.00 |
| Baker Industrial Services | 0.00 |
| Baker'S Office City | 0.00 |
| Banana Jons | 0.00 |
| BASF Corporation | 0.00 |
| BHA Group, Inc. | 0.00 |
| Bill's Machine Shop | 0.00 |
| Blue Cross Blue Shield Of AZ | 0.00 |
| Bob Worsley - Reimbursements | 0.00 |

# Snowflake White Mountain Power, LLC
## Vendor Balance Summary
### As of July 31, 2010

| VENDOR NAME | Jul 31, 10 |
|---|---|
| Border State Electric Supply | 0.00 |
| Boyer & Seeley Pumps & Process Inc. | 0.00 |
| BSK Analytical Laboratories | 0.00 |
| C & K Hose | 0.00 |
| C T Corporation | 0.00 |
| Caltrol, Inc | 349.85 |
| Carquest Of Taylor, Inc. | 143.46 |
| Carrier Vibrating Equipment | 0.00 |
| Catalyst Paper (Snowflake) Inc | 81,384.37 |
| CB North America | 0.00 |
| Ceridian Benefits Services | 0.00 |
| Cervantes-Delgato, Inc | 9,163.12 |
| Charlie Brandt Tire | 0.00 |
| Cheap Seats Portable Toilets | 450.00 |
| Chemical Transportation, Inc | 0.00 |
| City Of Mesa | 249.60 |
| Clifton Gunderson, LLP | 0.00 |
| Cobank | 36,708.39 |
| Colonial Scientific, Inc. | 0.00 |
| Columbia Analytical Services | 0.00 |
| Complete Financial Services, Inc. | 0.00 |
| Containers On Demand LLC | 0.00 |
| Control Distributors LLC | 0.00 |
| Con-way Freight, Inc. | 274.43 |
| Cookson Door Sales of AZ | 0.00 |
| Cooley Forest Products | 2,809.35 |
| Copper State Bolt & Nut Co. | 0.00 |
| Cortel Communictionas | 0.00 |
| Craig Stevens Reimb | 0.00 |
| Crane Nuclear Inc | 0.00 |
| Creative Communications, Inc | 0.00 |
| CRG Partners Group, LLC | 37,883.54 |
| CTI Trucking | 0.00 |
| D S Industrial | 290.62 |
| D.D. Haught Inc. | 0.00 |
| Delaware Secretary Of State | 0.00 |
| Demers Glass, Inc. | 0.00 |
| De-Nox Technologies | 0.00 |
| Desert Scales & Weighing Equip | 0.00 |

# Snowflake White Mountain Power, LLC
## Vendor Balance Summary
### As of July 31, 2010

| VENDOR NAME | Jul 31, 10 |
|---|---:|
| Doug's Crane Service, LLC | 0.00 |
| Doyle Electric | 0.00 |
| Dworkin, Chambers, Williams | 0.00 |
| Ed Ulrich Reimb | 0.00 |
| Edison Esi | 0.00 |
| Elda'S Cleaning Crew | 0.00 |
| Elephant Outlook | 0.00 |
| Elk Mountain Crane LLC | 0.00 |
| Emerson Network/Electrical Reliability sv | 2,100.00 |
| Empire Southwest, Inc | 0.00 |
| Eric Brye Reimb | 0.00 |
| Erm-West, Inc | 0.00 |
| Evergreen Engineering | 0.00 |
| Ewing Bemiss & Company | 7,619.93 |
| Fastenal Co. | 4,035.79 |
| Fedex | 17.14 |
| Fellon-McCord & Associates | 16,387.19 |
| Fenner Dunlop Conveyor Services | 0.00 |
| Fidelity Security Life Ins.  FSL/Eyemed P | 0.00 |
| Financial Federal Credit, Inc. | 11,304.45 |
| FM Global | 0.00 |
| Franchise Tax Board | 0.00 |
| Fred Mollenhauer | 0.00 |
| Freightliner | 0.00 |
| Frontier, Inc | 353.52 |
| Future Future, LLC | 0.00 |
| G.Neil | 0.00 |
| Gallagher & Kennedy | 0.00 |
| Garry Stevens - Reimb | 0.00 |
| General Electric International Inc. | 22,879.00 |
| George Ross | 0.00 |
| Gexpro | 0.00 |
| Glen's  Electric | 0.00 |
| Grainger | 0.00 |
| Graybar Electric Co. Inc | 0.00 |
| Greenberg Traurig, LLP | 4,690.18 |
| Gregory R. Knight & Associates P.C. | 0.00 |
| Hardcore Construction | 0.00 |
| Hazen Research, Inc. | 0.00 |

# Snowflake White Mountain Power, LLC
## Vendor Balance Summary
### As of July 31, 2010

| VENDOR NAME | Jul 31, 10 |
| --- | ---: |
| Helwig Carbon Products, Inc | 0.00 |
| Honeywell Industry Solutions | 0.00 |
| Hot Shot Delivery, Inc | 32.34 |
| Humboldt | 0.00 |
| Ies Industrial, Inc | 0.00 |
| Industra Service Corp | 0.00 |
| Industrial Controls | 0.00 |
| Industrial Fluid Systems | 1,093.24 |
| Insurance Inforamtion Exchange | 0.00 |
| Integrated Document Systems, LLC | 354.63 |
| InterCall | 0.00 |
| Intralinks, Inc | 3,240.00 |
| Iron Mountain | 316.23 |
| J & T Grindings OPS, LLC | 0.00 |
| J W Services Industrial, LLC | 0.00 |
| James, Cooke & Hobson, Inc. | 26,998.73 |
| JBR Environmental Consultants, Inc | 1,680.00 |
| Jeff Stillwell | 0.00 |
| Jesus Melchor | 0.00 |
| Jet Team Inc. | 0.00 |
| JL Steel | 0.00 |
| John Vanraalte | 0.00 |
| Joost Industrial, Inc | 4,802.71 |
| K & J Auto Parts | 0.00 |
| Katy Instruments Sales, LLC | 0.00 |
| KNL Holdings, LLC | 0.00 |
| Kone Cranes, Inc. | 0.00 |
| Lab Safety Supply | 0.00 |
| Labor Systems | 9,992.29 |
| Landamerica | 0.00 |
| LaRon Incorporated | 0.00 |
| Larson Waste, Inc. | 0.00 |
| Latham & Watkins LLP | 0.00 |
| Lawson Products | 0.00 |
| Lawyers Title of Arizona, Inc | 0.00 |
| Lumbermens, Inc | 0.00 |
| Magnum Industrial Distributors | 0.00 |
| Martin Engineering | 0.00 |
| McMaster-Carr Supply Co. | 0.00 |

# Snowflake White Mountain Power, LLC
## Vendor Balance Summary
### As of July 31, 2010

| VENDOR NAME | Jul 31, 10 |
|---|---|
| Mellon Investor Services, LLC | 0.00 |
| Menardi, LLC | 25,052.62 |
| Midwesco Filter Resources, Inc | 0.00 |
| Minarik Corporation | 0.00 |
| Mobile Mini, Inc. | 457.16 |
| Moore-McNeil, LLC | 0.00 |
| Motion Industries Inc. | 1,228.99 |
| Mountain Comfort Heating | 2,436.79 |
| MP Environmental Services | 0.00 |
| Nalco Company | 4,786.56 |
| Native Environment, LLC | 0.00 |
| Navajo County Treasurer | 0.00 |
| Newark | 0.00 |
| Northern Safety & Industrial | 441.84 |
| NZ Legacy Ranch, LLC | 0.00 |
| Occupational Safety Services | 0.00 |
| Page Steel | 2,853.74 |
| Paige Lagerhausen | 198.00 |
| Perfect Printz, LLC | 0.00 |
| Petty Cash - Garry Stevens | 0.00 |
| Pitney Bowes, Inc. | -27.54 |
| Powerplan, Inc | 0.00 |
| Praxair Distributing Inc | 6,262.73 |
| Precision Electric Co Inc. | 0.00 |
| Premium Assignment Corp | 0.00 |
| Process Automation & Simulatio | 4,728.69 |
| Process Equipment | 334.74 |
| PTO Sales Corp | 0.00 |
| Quadna | 0.00 |
| Quill Corporation | 0.00 |
| Qwest | 227.59 |
| RDO Equipment Co. | 0.00 |
| Reaves Law Group | 0.00 |
| Rema Tip Top North America Inc | 0.00 |
| Renegy Holdings | 0.00 |
| Renegy, LLC | 0.00 |
| Riley Industrial Services, Inc | 0.00 |
| Rio Puerco Construction Inc | 20,964.84 |
| Road Machinery | 0.00 |

# Snowflake White Mountain Power, LLC
## Vendor Balance Summary
### As of July 31, 2010

| VENDOR NAME | Jul 31, 10 |
|---|---|
| Robert Half International | 0.00 |
| Robert Terror | 9,000.00 |
| Robin Palmer | 0.00 |
| Roseberry and Associates, Inc. | 0.00 |
| RSC Equipment Rental | 3,395.61 |
| Russ Newberg | 0.00 |
| Salt River Project, Inc | 570.04 |
| Sassy Trucking | 0.00 |
| SCF Arizona | 0.00 |
| SensorTech Systems, Inc | 0.00 |
| Sentry Fire & Welding Supply | 0.00 |
| Shaw Consultants International | 0.00 |
| Southwest Rubber & Supply | 0.00 |
| Sparkletts | 30.98 |
| Sparkletts Water | 0.00 |
| Squire, Sanders & Dempsey LLP | 8,276.08 |
| SRE Freight, Inc. | 0.00 |
| Standard & Poor's | 0.00 |
| Stephen C. Stitt Dba 4-S Belt Splicing | 0.00 |
| Stephens & Sons Contracting | 0.00 |
| Sun Machinery Co. | 735.19 |
| T & M Trucking, Inc | 0.00 |
| Terry Stevens - Reimbursements | 0.00 |
| The Apache Railway Company | 0.00 |
| The Bank Of New York | 0.00 |
| The Bank Of New York Mellon Financial Con | 0.00 |
| Thornton Farish Inc. | 19,625.00 |
| Thyssenkrupp Safway, Inc. | 0.00 |
| Transcat, Inc | 0.00 |
| U.S. Air Filtration, Inc. | 1,619.07 |
| United Rentals NW, Inc | 0.00 |
| United Supply Source | 661.74 |
| Univar USA, Inc. | 0.00 |
| UPS, Inc | 62.12 |
| URS Corporation | 23,464.50 |
| US Premium Finance | 0.00 |
| USDA Forest Service C/O Citibank | 0.00 |
| V & N Parts & Sales, Inc. | 0.00 |
| Value-Centers, LLC | 0.00 |

# Snowflake White Mountain Power, LLC
## Vendor Balance Summary
### As of July 31, 2010

| VENDOR NAME | Jul 31, 10 |
|---|---|
| Verde Oro Farms | 0.00 |
| Versitech | 0.00 |
| Waste Management | 0.00 |
| Wesco, Brown's Electric Wholesale | 157.61 |
| Western Industrial | 0.00 |
| Western Power Service | 0.00 |
| Williams Brothers Auto Service | 0.00 |
| XL Fire Protection | 0.00 |
| Yokogawa Corporation of America | 0.00 |
| Young's Future Tire, Inc | 0.00 |
| Zakhem Law, LLC | 0.00 |
| | |
| Total Accounts Payable | 440,989.40 |

**Schedule 4.2 c**

**SWMP Shutdown & Repair Activities**
**Equipment to Order**
Non-return valves
Steam and water flanges gaskets replacements.
Dust Collector internals
Valve packing
Safety valves
Fuel Yard Transformer
Attemperator orifice flange supports
ID Fan inlet duct
Bags & Cages for baghouse
Bed Thermo wells and Thermocouples

# Schedule 5.2

# Plant Equipment

**Power Plant Assets**

| | |
|---|---|
| PP-01 | Ash System |
| PP-02 | Baghouse |
| PP-03 | Boiler |
| PP-04 | Boiler Fans |
| PP-05 | Building - Boiler |
| PP-06 | Building - Satellite Warehouse |
| PP-07 | Building - Sludge |
| PP-08 | Building - Turbine |
| PP-09 | Building - Turbine - Crane |
| PP-1 | Morbark LP50 Pole Peeler |
| PP-10 | Control Room |
| PP-11 | Cooling Tower |
| PP-12 | Fire Supression Systems |
| PP-13 | Fuel Handling Systems |
| PP-14 | Hog System |
| PP-15 | Plant Electrical |
| PP-16 | Plant Piping |
| PP-17 | Sand Screen |
| PP-18 | Sludge Systems |
| PP-19 | SNCR Electronic System |
| PP-20 | Soot Blower |
| PP-21 | Stack |
| PP-22 | Static Exciter |
| PP-23 | Substation |
| PP-23 | Substation Improvements |
| PP-25 | Switchgear |
| PP-26 | Transformer |
| PP-27 | Truck Dump & Reclaimer |
| PP-28 | Turbine/Gen/Condenser |

**Other Equipment**

1991 Ford F350 Pickup Truck
Volvo L90 Wheel Loader
1987 Volvo Roll Off Truck
1986 Mack Roll Off Truck
1983 Freightliner Roll Off Truck
1986 Freightliner Roll Off Truck
Wagner 100CHD Chip Dozer

# Schedule 5.3

## Consents

1) APS – Requires consent unless acquirer has creditworthiness equal to or higher than that of seller
2) APS under the APS Interconnection Agreement
3) Catalyst Paper
4) Future Forest

## Schedule 5.7

## Permits

1) 02-08-2006 Air Quality Control Permit (ADEQ)

2) 03-20-2008 Significant Permit Revision Air Quality Control Permit (ADEQ)

3) 07-18-2008 Ltr from ADEQ (Facility Change w-o Permit)

4) 07-19-2006 Minor Permit Revision to Air Quality Control Permit (ADEQ)

5) Abitibi APP Permit

6) Air Quality Control Permit

7) Permit P102251 Waste Water

8) Permit P103168 Storm Water

9) Storm Water Management Plan

10) 2010 ADEQ Air Permit Renewal Application

# Schedule 5.13

# Real Property

1) Catalyst – See Purchase Contracts

# Schedule 5.14

# Contracts (other than leases)
<u>See Schedule 2.1(a)(v) for documents</u>

1) **Catalyst Paper**
   a) Waiver of Surface Rights (8-31-2006)
   b) Consent and Agreement (09-01-2006)
   c) First Amendment to Waiver of Surface Rights (09-20-2007)
   d) Bill of Sale Ownership Interest (02-06-2008)
   e) Interconnection Facilities Ownership (02-06-2008)
   f) First Amendment to Consent and Agreement (04-10-2008)
   g) Settlement and Release Agreement (12-31-2008)
   h) CP Termination Letter & Agreement (07-31-09)

2) **Power Purchase Agreements & Amendments with Arizona Power Services**
   a) Master Power Purchase and Sale Agreement (08-06-2005)
   b) APS Point-to-Point Transmission Service (07-10-2006)
   c) Amended and Restated Transaction Confirmation APS (08-16-2006)
   d) APS Large Generator Interconnection Agreement (11-01-2006)
   e) APS Electric Supply Agreement (01-10-2008)
   f) Electric Supply Agreement (Amended) (06-06-2008)
   g) Proposed One-year APS agreement for first 10 MWh (09-1-2010)
   h) Proposed Interconnection Agreement with APS

3) **Cooley Forest Products Processing Agreement**
4) **Round Valley Agreement**
5) **Future Forest Sales Agreement 2-26-10**
6) **JT Grinding Agreement**

# Schedule 5.15

## Insurance

1) 2010 SCF ER Liability Policy Agreement
2) BCBS Master Contract 2010
3) Chartis Global Marine and Energy Property
4) EyeMed Contract & Renewal Forms
5) Guardian Employer Rider